JOEL D. SIEGEL (State Bar No. 155581)
Email: joel.siegel@snrdenton.com
PAUL M. KAKUSKE (State Bar No. 190911)
Email: paul.kakuske@snrdenton.com
SNR DENTON US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone: (213) 623-9300
Facsimile: (213) 623-9924

EDWARD PATRICK SWAN (State Bar No. 89429)
Email: pswan@luce.com
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101
Telephone: (619) 699-2415
Facsimile: (619) 645-5321

Attorneys for Defendant
First American Home Buyers
Protection Corporation

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY DIAZ, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FIRST AMERICAN HOME BUYERS PROTECTION CORPORATION, a California Corporation, and DOES 1-25<br><br>Defendants. | Case No.: 09-CV-00775-H (WMc)<br>Class Action<br><br>**REDACTED -- CONFIDENTIAL AND UNREDACTED VERSION LODGED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**<br><br>DECLARATION OF BRUCE A. STROMBOM IN SUPPORT OF DEFENDANT FIRST AMERICAN HOME BUYERS PROTECTION CORPORATION'S OPPOSITION TO CLASS CERTIFICATION<br><br>Date: August 22, 2011<br>Time: 10:30 a.m.<br>Courtroom: 13<br><br>[Oral Argument Requested; Local Rule 7.1(d)] |

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

2

3

4

5

6

7

8

9

10

11

12

SNR DENTON US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF BRUCE A. STROMBOM

I, Bruce A. Strombom, declare:

1.      I am a Managing Principal of Analysis Group, Inc. ("Analysis Group"), a national economic, financial, and strategy consulting firm.  I have been retained in this matter by SNR Denton US LLP, counsel for First American Home Buyers Protection Corporation, to review and respond to the March 24, 2011 report of Patrick F. Kennedy, Ph.D., with regard to issues of class certification.

2.      Attached as Exhibit A is a true and correct copy of my June 15, 2011 Expert Rebuttal Report in this regard, setting forth my opinions and the basis and reasons for them.

3.      A copy of my curriculum vitae, a listing of the facts and data that I considered in forming my opinions, a listing of cases in the previous four years in which I have testified, and a statement of compensation are included in the report.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on July 2̲8̲, 2011 at Los Angeles, California.

BRUCE A. STROMBOM

30381956

-1-

## Exhibits to Declaration of Bruce A. Strombom in Support of Defendant's Opposition to Plaintiff's Motion for Class Certification

| **Exh.** | **Description** | **Page** |
|---|---|---|

A       June 15, 2011 Expert Rebuttal Report of Bruce A. Strombom, Ph.D. ...................................3

# EXHIBIT A

*Confidential*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

EMILY DIAZ, on behalf of herself,
and all others similarly situated,

   Plaintiff,

    v.

FIRST AMERICAN HOME BUYERS
PROTECTION CORPORATION, a
California Corporation,

   Defendant.

Case No: 09-CV-0775 H (WMC)

**Expert Rebuttal Report of Bruce A. Strombom, Ph.D.**

June 15, 2011

*Confidential*

## Table of Contents

I.     Assignment ................................................................................................................. 1

II.    Qualifications .............................................................................................................. 1

III.   Documents Considered ................................................................................................ 2

IV.   Summary of Opinions .................................................................................................. 2

     A.    Individual inquiry into the facts associated with the resolution of each claim is required to show whether customers failed to receive the benefits promised by First American and, assuming a breach of the home-warranty contract occurred, to calculate the amount of damages, if any, suffered by the consumer. ................................................. 2

     B.    The amount calculated using Dr. Kennedy's "preliminary 'formula'" for rescission and restitution is not equal to the economic damages, if any, suffered by members of the proposed class. ........................................................................................................... 3

     C.    Dr. Kennedy's proposal to systematically exclude from his calculations any customers who received more in benefits from First American than they paid for the home-warranty contract and service fees will tend to overstate economic damages, if any, suffered by the proposed class. ............................................................................................. 3

     D.    Information provided by First American showing that approximately 96 percent of claims were not denied, indicates that the overwhelming majority of putative class members were not harmed at all due to "inappropriate" denial of claims. ...................... 3

     E.    The results of customer surveys conducted in the normal course of business after repairs were performed by First American's contractors suggests that the practice of completing only "band-aid repairs," if it occurs, is not wide-spread or prevalent. ......... 3

     F.    Dr. Kennedy's proposed methodology will also require individual inquiry into every claim that was not denied in order to determine the value of the repairs and/or replacements received because, as the Plaintiff has argued, amounts paid by First American to its contractors are different from, and generally less than, the value of those services to the customer. ................................................................................... 3

     G.    Dr. Kennedy fails to explain how his methodology will be applied in situations in which there are two members of the putative class for a single home-warranty contract – one who purchased the home-warranty contract as part of a real estate transaction and the other who made a claim under a home-warranty which they did not purchase. .............. 3

     H.    Dr. Kennedy provides no analytic or empirical bases for his opinion that First American's policies "may" or "could" create incentives leading to the inappropriate denial of claims or provision of band-aid fixes. ............................................................ 3

     I.    Dr. Kennedy fails to address the range of incentives affecting the conduct of First American's contractors or the fact that a flat rate system may be the most economically efficient method of compensating contractors. ............................................................. 4

     J.    Even if Plaintiff's assertions regarding the effect of uni-price and other flat rate pricing methods are correct, only a portion of the putative class could have been affected by these policies and the likelihood of being affected varies widely based on location and other factors. ......................................................................................................... 4

K.    Even if Plaintiff's assertions regarding the effect of uni-price and other flat rate pricing methods are correct, the differences between these payment methodologies are likely important and may create different incentives and different conduct across contractors assigned to different class members.  These incentives are also likely to vary both by market and over time. ................................................................................................ 4

V.    Background .......................................................................................................... 4

A.    First American.............................................................................................. 4

B.    Putative Class ............................................................................................... 5

C.    Remaining Causes of Action......................................................................... 5

VI.   Individual inquiry into the facts associated with the resolution of each claim is required to show whether customers failed to receive the benefits promised by First American and, assuming a breach of the home-warranty contact occurred, to calculate the amount of damages, if any, suffered by the consumer............................................................ 5

A.    Dr. Kennedy's preliminary formula .............................................................. 5

B.    Proper method for calculating economic harm ............................................. 7

VII.  Even assuming that class wide rescission is an appropriate remedy, Dr. Kennedy's proposed methodology is flawed .................................................................... 11

A.    Dr. Kennedy must determine the value of home repair services received by warranty holders .................................................................................................... 12

B.    Dr. Kennedy fails to explain how his methodology will be applied in situations in which there are two putative class members for a single home warranty contract ................. 15

VIII. Dr. Kennedy's analysis of the incentives faced by contractors is incomplete and misleading ....................................................................................................... 16

A.    Dr. Kennedy provides no analytic or empirical bases for his opinion that First American's policies "may" or "could" have created incentives leading to the inappropriate denial of claims or provision of band-aid fixes ....................................... 16

B.    Dr. Kennedy fails to address the full range of incentives affecting the conduct of First American's contractors or the fact that a flat rate system may be the most economically efficient method of compensating contractors in some situations .................................. 16

C.    First American's policies are unlikely to have a uniform impact on the conduct of all contractors and the impact on any particular contractor may vary over time................ 18

D.    Even if Plaintiff's assertions regarding the effect of uni-price and flat rate pricing are true, only a portion of the putative class could have been affected by these policies and the likelihood of being affected varies widely based on location................................... 19

E.    Even if Plaintiff's assertions regarding the effect of uni-price and flat rate pricing were correct, the differences between these payment methodologies are likely important and may create different incentives and conduct.................................................................. 22

ii

*Confidential*

**Expert Report of Bruce Strombom**
*Emily Diaz v. First American Home Buyers Protection Corporation*

## I.      ASSIGNMENT

1.   I have been retained by SNR Denton, Counsel for First American Home Buyers Protection Corporation ("First American"), in connection with the case *Emily Diaz v. First American Home Buyers Protection Corporation* pending in the United States District Court for the Southern District of California.

2.   I have been asked by counsel for First American to review and respond to the report of Dr. Patrick Kennedy with regard to issues of class certification.[1]

## II.     QUALIFICATIONS

3.   I am a Managing Principal of Analysis Group, Inc. ("Analysis Group"), a national economic, financial, and strategy consulting firm.  Analysis Group employs approximately 500 professionals and has ten offices throughout North America.  Analysis Group is compensated at my regular rate of $580 per hour for the time I spend on this matter.  Analysis Group's compensation is not dependant on the outcome of this case.

4.   I have over 30 years of experience in corporate finance and financial and economic analysis.  For the past 18 years I have been employed as a consulting and testifying expert in public policy matters and commercial litigation.  My work in commercial litigation has involved analyzing class certification, liability, loss causation, and damages issues on behalf of both plaintiffs and defendants.  I have qualified as an expert and testified in federal courts, United States Tax Court, and various state courts, and in arbitrations.  Prior to joining Analysis Group, I was Executive Vice President of Business Valuation for a middle-market merger and acquisition firm serving privately held businesses. In that capacity, I directed an organization of 75 market research and financial analysts that performed approximately 500 business valuations per year and provided guidance to business owners in a range of industries on strategies to enhance the values of their companies.  Earlier, I was a Consulting Manager in the Financial Advisory

---

[1] Report of Patrick F. Kennedy, Ph.D., March 24, 2011 (hereafter "Kennedy Report").

**Exhibit A
Page 6**

*Confidential*

Services group at the public accounting firm of Price Waterhouse and Senior Financial Analyst with Tribune Newspapers West.

5.  I hold a B.A. in economics from San Jose State University and a Ph.D. in economics from the University of California, Irvine.  My graduate education focused on applied microeconomics, industrial organization, and finance.

6.  A copy of my curriculum vitae is attached as **Appendix A**.  It includes a list of matters in which I have testified at deposition or trial and a list of my publications over the past ten years.

### III.  DOCUMENTS CONSIDERED

7.  In conducting my analysis I, or staff working under my direction, reviewed various documents and materials relevant to this case and interviewed First American personnel.  The materials reviewed include, among other things, the complaint,[2] First American's responses to interrogatories, emails to and from First American personnel, corporate reports, 10-Ks, surveys of First American customers, and the Kennedy Report.  The documents that I considered are listed in **Appendix B** and/or identified in this report or supporting exhibits.  My analysis and conclusions are based on the information available at the present time.  If additional information or materials become available or if Dr. Kennedy submits a supplemental report as he indicates he may, I reserve the right to update my opinions and analysis as appropriate.

### IV.  SUMMARY OF OPINIONS

8.  Following is a summary of my opinions, which are based on my analysis of case documents and other materials, my expertise in the areas of economics and damages analysis, and my academic training and professional experience.

  A.   Individual inquiry into the facts associated with the resolution of each claim is required to show whether customers failed to receive the benefits promised by First American and, assuming a breach of the home-warranty contract occurred, to calculate the amount of damages, if any, suffered by the consumer.

---

[2] Emily Diaz v. First American Home Buyers Protection Corporation, Second Amended Class Action Complaint, filed May 17, 2010 (hereafter "Complaint").

Confidential

**B.**     The amount calculated using Dr. Kennedy's "preliminary 'formula'" for rescission and restitution is not equal to the economic damages, if any, suffered by members of the proposed class.

**C.**     Dr. Kennedy's proposal to systematically exclude from his calculations any customers who received more in benefits from First American than they paid for the home-warranty contract and service fees will tend to overstate economic damages, if any, suffered by the proposed class.

**D.**     Information provided by First American showing that approximately 96 percent of claims were not denied, indicates that the overwhelming majority of putative class members were not harmed at all due to "inappropriate" denial of claims.

**E.**     The results of customer surveys conducted in the normal course of business after repairs were performed by First American's contractors suggests that the practice of completing only "band-aid repairs," if it occurs, is not wide-spread or prevalent.

**F.**     Dr. Kennedy's proposed methodology will also require individual inquiry into every claim that was not denied in order to determine the value of the repairs and/or replacements received because, as the Plaintiff has argued, amounts paid by First American to its contractors are different from, and generally less than, the value of those services to the customer.

**G.**     Dr. Kennedy fails to explain how his methodology will be applied in situations in which there are two members of the putative class for a single home-warranty contract – one who purchased the home-warranty contract as part of a real estate transaction and the other who made a claim under a home-warranty which they did not purchase.

**H.**     Dr. Kennedy provides no analytic or empirical bases for his opinion that First American's policies "may" or "could" create incentives leading to the inappropriate denial of claims or provision of band-aid fixes.

*Confidential*

I.      Dr. Kennedy fails to address the range of incentives affecting the conduct of First American's contractors or the fact that a flat rate system may be the most economically efficient method of compensating contractors.

J.      Even if Plaintiff's assertions regarding the effect of uni-price and other flat rate pricing methods are correct, only a portion of the putative class could have been affected by these policies and the likelihood of being affected varies widely based on location and other factors.

K.      Even if Plaintiff's assertions regarding the effect of uni-price and other flat rate pricing methods are correct, the differences between these payment methodologies are likely important and may create different incentives and different conduct across contractors assigned to different class members. These incentives are also likely to vary both by market and over time.

9.   I understand that Dr. Kennedy intends to prepare a supplemental report in which he will attempt to quantify the amount he believes is payable to members of the putative class if the contracts are rescinded. If and when Dr. Kennedy submits his supplemental report, I intend to submit a supplemental report containing my opinions related to that analysis.

## V.      BACKGROUND

### A.      First American

10. First American is a subsidiary of First American Title Insurance Co., a wholly-owned subsidiary of First American Financial Corporation, and has been in business for over 25 years.[3] It sells home warranties "that cover residential systems and appliances against failures that occur as a result of normal usage during the coverage period."[4] Most of the contracts at issue are sold in conjunction with residential real estate resale transactions. The contracts are generally for one year and can be renewed annually by the customer at their option with the approval of First American. New contracts are generally sold through real estate brokers and agents while renewals are sold directly to the consumer.[5]

---

[3] https://homewarranty.firstam.com/Default.aspx, visited March 31, 2011.
[4] First American Financial Corporation, December 31, 2010, Form 10-K, p. 12.
[5] First American Financial Corporation, December 31, 2010, Form 10-K, p. 12.

**Exhibit A
Page 9**

**B.     Putative Class**

11. The class proposed by the Plaintiff is defined in the Complaint as follows.

All persons and entities in the United States who, during the period from approximately March 6, 2003, through the present (the "Class Period"), purchased, and/or made a claim under, a home warranty policy issued by Defendant First American Home Buyers Protection Corporation. Excluded from the class are defendants and their parents, subsidiaries, affiliates, all governmental entities, and co-conspirators.[6]

**C.     Remaining Causes of Action**

12. I understand that there are currently five remaining causes of action: breach of contract, breach of implied covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation, and false promise. The first two causes of action I will refer to as the Breach Claims and the last three as the Fraud Claims.

13. Dr. Kennedy offers an opinion related only to the amount payable to putative class members if the Court finds rescission and restitution is the appropriate remedy. He does not calculate or propose a method for calculating damages appropriate for the Breach Claims. I begin my report by discussing the discrepancy between Dr. Kennedy's proposed rescission/restitution calculation and how one would calculate economic damages for the Breach Claims. I then discuss the problems with Dr. Kennedy's proposed methodology for determining the amount payable to class members for rescission/restitution.

**VI.    INDIVIDUAL INQUIRY INTO THE FACTS ASSOCIATED WITH THE RESOLUTION OF EACH CLAIM IS REQUIRED TO SHOW WHETHER CUSTOMERS FAILED TO RECEIVE THE BENEFITS PROMISED BY FIRST AMERICAN AND, ASSUMING A BREACH OF THE HOME-WARRANTY CONTACT OCCURRED, TO CALCULATE THE AMOUNT OF DAMAGES, IF ANY, SUFFERED BY THE CONSUMER.**

**A.     Dr. Kennedy's preliminary formula**

14. Dr. Kennedy proposes a "preliminary 'formula'" that he claims can be used to calculate the amount due to class members under a rescission/restitution theory.[7] Dr. Kennedy conflates the remedy of restitution (an equitable remedy intended to restore the parties to the

---

[6] Complaint, ¶13.
[7] Kennedy Report, p. 6.

Confidential

status quo ante after a contract has been rescinded) and the concept of economic damages (or simply "damages"), which are intended to give a contracting party the benefit of the bargain Kennedy appears to use those terms interchangeably throughout his report. Even assuming putative class members are entitled to rescind, the amount of restitution to which they are entitled has no relation at all to the amount of economic harm, or damage, that the putative class has suffered.

15. Dr. Kennedy does not offer an opinion about the amount of economic damages suffered by class members for the Breach Claims nor can Dr. Kennedy's preliminary formula for rescission be used to calculate damages. The only relationship between the amount determined by Dr. Kennedy's formula and, assuming they exist, economic damages suffered by class members is that Dr. Kennedy's formula would overstate them. In reality, individual inquiry is needed to assess whether members of the putative class failed to receive the benefits they were entitled to under the home-warranty contract and have thereby been damaged and, if so, to calculate the amount of those damages.

16. Dr. Kennedy's proposed methodology is to sum the amounts paid for home-warranty plans by all class members, add the amount that putative class members paid out-of-pocket for service fees, and subtract repairs and/or replacements received.[8, 9] This calculation will not assist the trier of fact in determining the economic harm suffered by putative class members for several reasons. First, approximately 52 percent of First American's warranty holders never made a claim.[10] Second, approximately 95.9 percent of claims made during the proposed class period resulted in either a repair, replacement, or cash out payment.[11, 12] Third, among the 4.1 percent

---

[8] Kennedy Report, p. 7.

[9] Dr. Kennedy states that "no damages would be claimed for class members where the amount received by the plan holder for repairs and replacement exceeds the amount paid for the warranty plan and service calls" (Kennedy Report, footnote 14, p. 7). It appears that Dr. Kennedy plans to include in his damages calculation only those people who he believes received less in benefits than they paid. Simply receiving less in benefits than a customer paid, however, does not mean the customer was harmed and, conversely, receiving more in benefits than a customer paid does mean that the customer was not harmed. The nature of a warranty is such that, even assuming all claims are handled appropriately by the home-warranty company, there will be some customers who receive less in benefits than they paid and some who receive more. Dr. Kennedy's proposal to systematically exclude customers who received more benefits from First American than they paid in premiums and service fees will overstate damages.

[10] FAHB-DIAZ 126301.

[11] Defendant First American Home Buyers Protection Corporation's Second Amended Responses to Plaintiff Emily Diaz's First Set of Special Interrogatories, Response to Special Interrogatory No. 16 (pp. 7-8).

[12] Warranty holders have the option of receiving a payment from First American in lieu of having the item repaired. This practice is known as a cash out. (First American Home Warranty Plan (FAHB-DIAZ079027 – FAHB-

*Confidential*

of claims that were denied, the only portion that could have resulted in damage are those claims that were inappropriately denied. Any claim that was appropriately denied based on the terms of the contract could not have resulted in damage to the putative class member because they received what they were entitled to under the contract and, therefore, suffered no harm. Fourth, the value of the repairs received by the putative class member is unknown and, in general, not equal to the amount paid by First American to the contractors who performed the repairs.

### B.   Proper method for calculating economic harm

17. To calculate the economic harm, if any, suffered by members of the proposed class, one must determine the value of services the putative class member was entitled to receive under the contract but were inappropriately denied by the actions of First American. This calculation would require significant individual inquiry into each claim.

18. Before commencing that discussion, however, I will review the way in which home warranties are sold and the implications this has for the putative class, which consists of people who purchased and/or made a claim under their First American home-warranty.[13]  A significant portion of home warranties are sold as part of a residential real estate transaction in which the seller of the residence purchases a home-warranty.[14]  Therefore, the putative class can be broken into two groups based on whether the home-warranty was purchased by a home seller and provided to the home buyer as part of a real estate transaction ("Real Estate Transaction Class Members") or whether the customer purchased the home-warranty from First American ("Direct Purchase Class Members"). Real Estate Transaction Class Members can further be subdivided between the individuals who purchased the home warranty ("Real Estate Purchase Class Members ") and those for whose benefit the home warranty was purchased ("Real Estate Warranty Holder Class Members").

19. Each of these groups can again be broken into two sub groups based on whether the putative class member made a claim. Direct Purchase Class Members who made a claim will be referred to as Direct Purchase Class Members With a Claim and Direct Purchase Class Members who did not made a claim will be referred to as Direct Purchase Class Members Without a

---

DIAZ079028 at FAHB-DIAZ079028 and First American Home Buyers Protection, Cost Per Claim Report, August 2007, pp. 2 (FAHB-DIAZ114867 – FAHB-DIAZ114881 at FAHB-DIAZ114868).
[13] Complaint, ¶13.
[14] First American Financial Corporation, December 31, 2010, Form 10-K, p. 12.

*Confidential*

Claim. None of the Real Estate Purchase Class Members made a claim because they do not hold the home warranty. They simply purchased the warranty as part of the real estate transaction and had no other dealings with First American. All Real Estate Warranty Holder Class Members by definition made a claim because these individuals did not purchase the warranty; they are in the putative class only because they made a claim.[15] The following diagram provides a decision tree to assist the reader in determining into which group a warranty holder or individual who purchased a contract is classified.



20. I will now review the proper methodology for calculating economic harm or damages.

21. To calculate economic damages, one must first determine if a putative class member made a claim. If a putative class member did not make a claim, the class member has not been denied any benefits promised by First American in the contract and has thus not suffered any harm. This applies for both Direct Purchase Class Members Without a Claim and Real Estate Purchase Class Members who by definition did not make a claim. While none of the Real Estate Purchase Class Members have made a claim, and have thus not been damaged, it must also be considered that for many of these putative class members the warranty holder for whom they

---

[15] Contract holders who received a contract from a Real Estate Purchase Class Member and did not make a claim are not part of the proposed class and will be ignored.

purchased the contract did not make a claim and, therefore, are not even members of the proposed class. As noted above, during the period for which data are readily available, approximately 52 percent of warranty holders did not make a claim.[16]

22. The next step is to determine if those putative class members who made a claim (i.e. Direct Purchase Class Members With a Claim) had the claim denied. If the claim was not denied and the service was performed consistent with the contract, then the putative class member was not harmed. Based on First American's interrogatories, only a small portion of claims were denied. **Table 1** contains a summary of the number of claims submitted to First American, the number denied, the percentage of claims denied, and the percentage of claims for which service was provided.

**Table 1**

| Year | Number of Claims | Number of Denials | Number of Serviced Claims | Denial Percentage | Service Percentage |
|------|------------------|-------------------|---------------------------|-------------------|--------------------|
| 2003 | | | | 4.6% | 95.4% |
| 2004 | | | | 4.2% | 95.8% |
| 2005 | | | | 4.1% | 95.9% |
| 2006 | | REDACTED | | 4.5% | 95.5% |
| 2007 | | | | 2.8% | 97.2% |
| 2008 | | | | 4.0% | 96.0% |
| 2009 | | | | 4.5% | 95.5% |
| 2010 | | | | 4.6% | 95.4% |
| **Total** | | | | **4.1%** | **95.9%** |

Source: Defendant First American Home Buyers Protection Corporation's Second Amended Responses to Plaintiff Emily Diaz's First Set of Special Interrogatories, Response to Special Interrogatory No. 16 (pp. 7-8).

23. As can be seen in the table, the denial rate by year between March 6, 2003 and April 21, 2010 ranged from a low of 2.8 percent in 2007 to 4.6 percent in 2003 and first part of 2010. Over the entire period, First American denied only 4.1 percent of the approximately 4.8 million claims it processed.[17] This means that, based upon the evidence, there are no damages due to inappropriately denied claims for at least 95.9 percent of claims.

---

[16] FAHB-DIAZ 126301.

[17] Defendant First American Home Buyers Protection Corporation's Second Amended Responses to Plaintiff Emily Dian's First Set of Special Interrogatories, Response to Special Interrogatory No. 16 (pp. 7-8).

*Confidential*

24. One must then determine among the 4.1 percent of claims that were denied which claims were inappropriately denied. If a claim was properly denied consistent with the terms of the contract, then there are no damages for the claim because the warranty holder received the benefit promised in the contract. This is not an analysis that can be done electronically and would require a detailed, claim by claim review of the nature of each claim and why it was denied.

25. I understand that the Plaintiff asserts that First American contractors "perform band-aid fixes rather than perform necessary replacements."[18] Individual inquiry would be needed to determine if the allegation is true. For every claim that was not denied, one would need to determine if a "band-aid fix" had been performed and the extent to which the repair was incomplete. There is likely to be a wide spectrum of quick fixes that a contractor could employ that may be more or less appropriate and result in more or less harm to the warranty holder.

26. Finally, for each inappropriately denied claim, assuming any exist, one must determine the value of the services that should have been provided by First American. The estimate of the value will be claim specific and may depend on many factors including, but not limited to, the nature of the repair, the age of the broken item, the age of the house and related systems, the geographic location of the home, the year in which the repair should have been made, and whether the repair was an emergency and/or completed after hours or on a weekend.

27. To summarize, the proper determination of damages requires that one identify and quantify the benefit that the putative class members should have received pursuant to their home warranty, but did not receive because of the actions of First American. To do this, among other things, one must identify which claims were inappropriately denied and the value of the services the warranty holder who submitted each claim was entitled to, but did not receive. Based on information provided by First American in this litigation, the overwhelming majority of putative class members were not harmed at all due to the denial of claims.

28. Concerning band-aid fixes, while I have formed no opinion about whether Plaintiff's assertion is true, the data I have reviewed suggest that it is unlikely that the practice, assuming it occurs, is wide spread. I have reviewed the results of surveys conducted in the normal course of business by TeleSight, Inc. ("TeleSight") on behalf of First American. For any contractor

---

[18] Complaint, ¶35(c).

10

*Confidential*

selected for the survey after the contractor has completed a job, TeleSight contacts the warranty holder and asks a number of questions about their experience and the performance of the contractor. There are three survey questions that are relevant to assessing the warranty holder's experience and whether the contractor was likely to have performed a band-aid repair. Respondents were asked to select a number on a scale from one to five in which one indicates the warranty holder was completely dissatisfied and five indicates that the warranty holder was completely satisfied. A four indicates the warranty holder was satisfied.

29.


# REDACTED


30. It is important to note that all these surveys were conducted after a First American contractor had serviced the warranty holder's home. Therefore, the respondents had recent, first-hand experience with First American's contractors. Taken on their face the high scores that warranty holders gave First American would not be expected if performing band-aid repairs was a common practice. The survey results suggest that the practice, if it occurs, is not wide-spread or prevalent.

## VII.    EVEN ASSUMING THAT CLASS WIDE RESCISSION IS AN APPROPRIATE REMEDY, DR. KENNEDY'S PROPOSED METHODOLOGY IS FLAWED

31. Even if the trier of fact finds First American liable for the Fraud Claims and the Court determines that rescission is the proper remedy, the formula proposed by Dr. Kennedy cannot be used to calculate the amount owed.

---

[19] Differences due to rounding.
[20] Firstam Report 2011_FEB.xls. (CONFIDENTIAL_FAHB-DIAZ0126273).

*Confidential*

32. I understand that as a matter of law, the intent of rescission is to return the parties to the status quo that existed before the contract to be rescinded was entered into. Economically, this means that each party returns whatever benefit it received from the other party. In the context of this case, it would mean that First American would return the money it received for home warranties and the out-of-pocket expenses paid to its contractors by home warranty holders. In exchange, warranty holders that received home repair services or cash out payments from First American would disgorge the value of those services and payments.

33. There are two main problems with Dr. Kennedy's proposed methodology.

### A. Dr. Kennedy must determine the value of home repair services received by warranty holders

34. To implement his methodology, Dr. Kennedy must determine the value of the services provided by First American to warranty holders and this determination can be made only with inquiry into the circumstances surrounding each claim. By the Plaintiff's own assertions, the value received by warranty holders is not equal to the amount First American paid to its contractors.[21] The value to the warranty holder is equal to the retail value of the services received.

35. First American pays contractors using a number of different methods including, among others, uni-price, flat rate, default flat rate, valued, and non-flat rate (i.e. bid).[22] Among these payment methods, only the valued and non-flat rate methods are time and materials rates. The other payment methodologies all entail some sort of risk sharing between the contractor and First American in which the contractor is paid a set amount regardless of how costly it turns out to be to complete the work.[23] This means that the amount paid to the contractors for any particular job is not directly related to how long it takes or the costs of parts and materials needed to complete the work. While on average over a large number of jobs, the contractors may receive a competitive rate, on some jobs they may be paid more than it costs them to complete the repair while on other jobs they may be paid less. On each individual job, depending on the

---

[21] Complaint, ¶5.

[22] Historically, First American has also paid contractors using the revised Uni-price method, but First American does not currently use the method.

[23] Terms, Definitions, and Procedures (FAHB-DIAZ00397 – FAHB-DIAZ00399 at FAHB-DIAZ00397).

payment method used, there may be little or no relationship between what First American pays the contractor and the value of those services to the warranty holder.

36. A second complication for determining the value of services provided by First American is that, according to Plaintiff, First American "pays its contractor well below the market rate for their services."[24] Therefore, assuming the Plaintiff's claims are determined to be true, even if one were to ignore the fact that the amount that First American pays a contractor for an individual claim is different than the value of the services provided, the amount that First American pays its contractors would still understate the value received by the warranty holders.

37. While I have not investigated Plaintiff's assertion that First American pays its contractors below retail rates, there are several valid economic reasons to expect that First American would be able to negotiate such rates. For example, First American may be able to provide a volume of work to a contractor, which helps ensures that the contractor does not have unproductive down time and receives a target number of customer referrals. Volume discounts are common in a wide range of economic transactions. An email to First American from one of its contractors provides an example of this in practice. In the email, the contractor explains that they stopped providing service under a uni-price contract because they were receiving insufficient volume.[25] In other words, the contractor was willing to accept uni-price pricing in exchange for a larger volume of work and the possibility of customer referrals.

38. A comparison of First American's claim volume by state and the proportion of claims serviced by contractors who are paid on a time and material basis (who First American refers to as bid or valued contractors) as opposed to those compensated under a uni-price or other flat rate agreement supports the hypothesis that First American is able to negotiate lower rates by providing a larger volume of work. The three states in which First American has the largest presence are Arizona, California, and Texas. In 2007, the proportion of claims that were serviced by bid or valued contractors was REDACTED in California, REDACTED in Texas, and REDACTED in Arizona (see **Exhibit 1**). As can be seen in **Exhibit 1**, as the number of claims serviced by First American in a state declines, the percentage of those claims paid on a time and

---

[24] Complaint, ¶5.
[25] Emails from Velina Reese of Reese Plumbing to Christina Buford of First American, dated December 31, 2009 (FAHB-DIAZ031712- FAHB-DIAZ031713 at FAHB-DIAZ031712).

material basis generally increases. This pattern is evidenced in 2008, 2009, and 2010 as well (see **Exhibits 2 to 4**).[26]

39. To conduct a more formal test of the relationship between the number of claims in a state and the average percentage of claims paid on a time and material basis, I divided the states into four categories based on claim volume. The categories are states with more than 25,000 claims (Category 1), states with between 5,000 and 25,000 claims (Category 2), states with between 1,000 and 5,000 claims (Category 3), and states with less than 1,000 claims (Category 4). Within each category, I then calculated the average of the percentage of claims paid on a time and material basis weighted by the number of claim in each state. **Exhibit 5** contains the results. In 2007, the weighted average for California, Texas, and Arizona, the only three states in Category 1, was **REDACTED** In contrast, the averages for the other categories were **REDACTED** **REDACTED** percent for Categories 2, 3, and 4 respectively. 2008, 2009, and 2010 exhibit the same pattern.

40. Working for First American may also allow contractors to reduce the amount of time and money they spend marketing their services. Perhaps most importantly, working for First American allows contractors to work for new homeowners who are likely to need the services of a contractor in the future. This allows contractors the opportunity to develop ongoing relationships with homeowners that may result in future work and possibly referrals to other homeowners.

41. In contrast to First American, individual homeowners do not have the same ability to negotiate below retail rates. Therefore, homeowners would likely have needed to pay more than First American actually paid to obtain services similar to those provided by First American. Individual inquiry would be needed to determine the rates that each customer would have paid for the particular services they received. As discussed in paragraph 26 above, the factors that

---

[26] Exhibits 1 to 4 were created from data provided by First American on the types of contractors that services each claim for 2007 through 2010. Each observation in the data is a separate work order on a claim and the contractor type (i.e., method of compensation) can vary by work order. For a portion of records, the contractor type could not be identified, and the record was omitted from the analysis. This happened more frequently in 2007 when it occurred approximately a third of the time.

It is possible for a claim to have more than one work order and, thus, more than one contractor type for the same claim. In these cases, when the contractor types were the same for all work orders within a claim, the record was maintained in the analysis. When the contractor type varied within a claim, the claim was omitted from the analysis. Approximately, six percent of claims in the raw data had multiple work orders where the contractor type varied.

would affect those rates include, but are not limited to, the nature of the repair, the age of the broken item, the age of the house and related systems, the geographic location of the home, the year in which the repair was made, and whether the repair was an emergency and/or completed after hours or on a weekend.

42. Therefore, to implement Dr. Kennedy's proposed methodology on a class wide basis will require individual inquiry into every claim for which service was provided. As shown in **Table 1**, between March 6, 2003 and April 21, 2010 this is over REDACTED claims.

**B.    Dr. Kennedy fails to explain how his methodology will be applied in situations in which there are two putative class members for a single home warranty contract**

43. Dr. Kennedy's proposed formula does not take into account that for home warranty contracts purchased in a real estate transaction, the party that often purchases the contract is the party selling the real estate. The buyer of the real estate receives the contract as part of the home purchase transaction. This means that the party that paid for the home-warranty contract and the party that received the benefit of services provided by First American for the same contract are not the same. Dr. Kennedy fails to explain how he would apply his formula for contracts issued as part of these real estate transactions.

44. Ascertaining the identity of the person who paid for the home warranty requires an individual inquiry on a case-by-case basis. For example, Ms. Diaz testified at her deposition that her purchase offer for the property at issue designated that the seller pay for a home warranty policy issued by "CRES."[27] The seller counter-offered that the home warranty company was to be the seller's choice, and ultimately the seller selected First American.[28] (The check for the real estate transaction in which Emily Diaz received her First American home-warranty contract was drawn on the escrow account for the purchase and did not specifically identify who paid for the home warranty.[29])

---

[27] Deposition of Emily Diaz, dated January 26, 2011, p. 86:8 – 87:8.
[28] Deposition of Emily Diaz, dated January 26, 2011, p. 87:9 – 89:8.
[29] Orange Coast Title Lender Resale Escrow Account, Check Number 018370, dated December 24, 2007 (Orange Coast 035).

*Confidential*

## VIII.   DR. KENNEDY'S ANALYSIS OF THE INCENTIVES FACED BY CONTRACTORS IS INCOMPLETE AND MISLEADING

### A.   Dr. Kennedy provides no analytic or empirical bases for his opinion that First American's policies "may" or "could" have created incentives leading to the inappropriate denial of claims or provision of band-aid fixes

45. Dr. Kennedy recites in his report a number of the Plaintiff's assertions made in the complaint including the claim that First American's policies create an incentive for contractors to improperly deny claims, refuse to work on expensive jobs, conduct poor repairs, and charge excessive rates for non-warranty work provided to warranty holders.[30]  Dr. Kennedy opines that the uni-price payment mechanism and other payment methods that reimburse the contractor at a flat rate "*may* create an incentive for contractors to deny larger, but valid claims"[31] and "*could* create an incentive for the contractor to minimize the amount of work performed."[32]  The value of this opinion to the court is obviously doubtful, since it is also possible that First American's policies may not, and do not, create such incentives.  Regardless of its value to the court, no analytic or empirical bases for this opinion are provided in the Kennedy Report.

### B.   Dr. Kennedy fails to address the full range of incentives affecting the conduct of First American's contractors or the fact that a flat rate system may be the most economically efficient method of compensating contractors in some situations

46. Dr. Kennedy claims that First American's policies, which include the use of the flat rate uni-price payment system and the flat rate system, along with First American's practice of allocating work based, in part, on the average invoice amount, could give contractors the incentive to deny larger claims and to minimize the amount of work performed.[33]  Even if these policies tend to create such an incentive, it would be only one of many incentives under which First American's contractors operate.  I will not attempt here to provide a complete discussion of the incentives to contractors under First American's policies, but rather will identify only some of the more important considerations not addressed by Dr. Kennedy.

47. One strong countervailing incentive contractors have is the incentive to secure repeat business or referrals from homeowners.  Many home-warranty customers receive their contract

---

[30] Kennedy Report, p. 4.
[31] Kennedy Report, p. 4 (emphasis added).
[32] Kennedy Report, pp. 4-5 (emphasis added).
[33] Kennedy Report, pp. 4-5.

*Confidential*

when they buy a home. Many of these homeowners will need trades people to work on their homes for years to come. If a contractor performs high quality work to the satisfaction of the warranty holder, it is more likely that the customer will call the contractor or refer others to them in the future. Based on information gathered from First American warranty holders, the majority of warranty holders are likely to refer others to the First American contractors that provided service to them.

48.

**REDACTED**

These results indicate that the potential benefit of repeat or referral business for First American contractors may be significant. It also suggests that most warranty holders surveyed are satisfied with the contractors performing work for First American.

---

[34] First American Contractor Survey Reports Perpared by TeleSight, Inc. - Firstcon Report 20071101.xls (CONFIDENTIAL_FAHB-DIAZ0126274); Firstcon Report 2007DEC.xls (CONFIDENTIAL_FAHB-DIAZ0126275); Firstcon Report special vendors.xls (CONFIDENTIAL_FAHB-DIAZ0126300); Firstcon Report 2008 JAN.xls (CONFIDENTIAL_FAHB-DIAZ0126276); Firstcon Report 2008 MAR.xls (CONFIDENTIAL_FAHB-DIAZ0126277); Firstcon Report 2008JUNE.xls (CONFIDENTIAL_FAHB-DIAZ0126283); Firstcon Report 2008JULY.xls (CONFIDENTIAL_FAHB-DIAZ0126282); Firstcon Report 20080827.xls (CONFIDENTIAL_FAHB-DIAZ0126278); Firstcon Report 20080917.xls (CONFIDENTIAL_FAHB-DIAZ0126279); Firstcon Report 20081015.xls (CONFIDENTIAL_FAHB-DIAZ0126280); Firstcon Report 20081215.xls (CONFIDENTIAL_FAHB-DIAZ0126281); Firstcon Report 20090216.xls (CONFIDENTIAL_FAHB-DIAZ0126284); Firstcon Report 20090305.xls (CONFIDENTIAL_FAHB-DIAZ0126285); Firstcon Report 20090515.xls (CONFIDENTIAL_FAHB-DIAZ0126286); Firstcon Report 20090615.xls (CONFIDENTIAL_FAHB-DIAZ0126287); Firstcon Report 20090715.xls (CONFIDENTIAL_FAHB-DIAZ0126288); Firstcon Report 20090817.xls (CONFIDENTIAL_FAHB-DIAZ0126289); Firstcon Report 20090914.xls (CONFIDENTIAL_FAHB-DIAZ0126290); Firstcon Report 20091015.xls (CONFIDENTIAL_FAHB-DIAZ0126291); Firstcon Report 20091215.xls (CONFIDENTIAL_FAHB-DIAZ0126292); Firstcon Report 20100115.xls (CONFIDENTIAL_FAHB-DIAZ0126293); Firstcon Report 2010215.xls (CONFIDENTIAL_FAHB-DIAZ0126294); Firstcon Report 2010517.xls (CONFIDENTIAL_FAHB-DIAZ0126295); Firstcon Report 2011115.xls (CONFIDENTIAL_FAHB-DIAZ0126298); Firstcon Report 2011215.xls (CONFIDENTIAL_FAHB-DIAZ0126299); Firstcon Report 20110215.xls (CONFIDENTIAL_FAHB-DIAZ0126296); and Firstcon Report 20110415.xls (CONFIDENTIAL_FAHB-DIAZ0126297).

*Confidential*

49. Another incentive not addressed by Dr. Kennedy is that created by First American's policy of assigning work to contractors based in part on their performance.[35] Contractors who perform poorly may lose work and risk having their contract revoked. First American has an incentive to penalize contractors who perform poorly because poor performance by its contractors reflects poorly on First American. This form of monitoring is a common method used by firms to ensure that third party service providers, employees and others meet appropriate standards of performance.[36]

50. In addition to his failure to address the full range of incentives affecting contractors, Dr. Kennedy appears to ignore the fact that many professionals and trades people provide services under similar fixed fee arrangements every day and face the same general incentive to provide required services at minimum cost. There is nothing inherently wrong with paying a flat fee for the performance of a service and such arrangements can be the most economically efficient in many situations. Examples in which services are provided under fixed fee arrangements include roofers, painters, and other trades people working under a fixed bid contract, and employees who are paid a fixed salary. To expand on the last example, salaried employees may have an incentive to minimize the amount of work they perform because their pay for the current period does not depend on their effort. At the same time, excellent performance will increase the chance of continued employment and the possibility of promotions and merit increases in the future. These two incentives work in opposite directions. Dr. Kennedy's analysis apparently only considers the incentive to minimize work effort and ignores the existence of other countervailing, and potentially more powerful, incentives faced by First American's contractors.

### C. First American's policies are unlikely to have a uniform impact on the conduct of all contractors and the impact on any particular contractor may vary over time

51. Whether and how First American's policies affect the conduct of contractors depends on a number of factors that vary across contractors and over time. For example, the cost structures under which contractors operate vary from contractor to contractor. What is an acceptable arrangement for one contractor may not be acceptable for another. This means that

---

[35] *See* Deposition of Richard M. Gosselin, dated May 10, 2011, p. 130:6-132:1.
[36] See for example, Laffont, Jean-Jacques and David Martimort. The Theory of Incentives – The Principal-Agent Model. Princeton: Princeton University Press, 2002

**Exhibit A
Page 23**

two contractors may respond differently to the same compensation level and structure. Further, since cost structures, demand and the level of utilization may change over time, it is also possible that a given contractor may respond differently to the same policies at different points in time.

52. For example, the recent downturn in the real estate market led to a decline in the level of construction activity in most markets throughout the U.S. from 2007 to the present. **Exhibit 6** contains a summary of housing permits for new privately-owned housing units by state from 2003 to 2009. **Exhibit 7** contains the same information, but the data for each state is normalized to 2003 to allow easier comparisons across states. **Exhibit 7** shows that the number of building permits authorized in 2009 was only 31 percent of the number authorized in 2003. In Arizona and California, the level in 2009 was even lower at 19 and 18 percent respectively. In such an environment, contractors may find it relatively more attractive, and may have different incentives than earlier, to work for a home-warranty company able to provide a volume of work. In addition, given differences in the decline in the level of construction activity across the United States, it is possible that contractors in some markets, for example, California and Arizona, may be impacted more significantly than contractors in markets that did not suffer as steep declines.

> **D.** **Even if Plaintiff's assertions regarding the effect of uni-price and flat rate pricing are true, only a portion of the putative class could have been affected by these policies and the likelihood of being affected varies widely based on location**

53. Even if the Plaintiff's assertion that uni-price or other flat rate payment methods created incentives for some contractors to deny claims, refuse large jobs, upcharge contract owners, or minimize work is correct, the likelihood that a putative class member was affected by those incentives varies widely by location. In order to be affected by these incentives, assuming they exist, a putative class member must have had a contractor paid under uni-price or another flat rate method assigned to their claim. If the contractor who worked on the putative class member's home was paid under a different payment method, then it is not reasonable to assume the putative class member was in any way harmed by how First American pays other contractors.

54. I have reviewed a number of First American reports that analyze claim payment patterns as well as a summary of First American claims submitted between 2007 and 2010 that identifies the payment method of the contractors that serviced the claims, which I have summarized in **Exhibits 1 to 4**. These exhibits indicate that approximately    **REDACTED**

*Confidential*

**REDACTED** of all claims were paid under the bid or valued payment method depending on the year. Under both bid and valued payment methods the contractor is compensated on a time and material basis. The only difference between the two is that contractors classified as valued have historically offered low rates to First American and are therefore generally allocated work before bid contractors.[37]

55. As an alternative to receiving service from a First American contractor, warranty holders have the option of receiving a cash payment in lieu of a repair. Warranty holders who took this option were not affected by First American's use of the uni-price or other flat rate payment method. Between 2007 and 2010 the percentage of claims that received a cash out payment was between    **REDACTED**    (see **Exhibits 1 to 4**).

56. These results indicate that for approximately **REDACTED** claims serviced in 2007, the home-warranty holder was not assigned a contractor who was paid using a payment method at issue (see **Exhibit 1**). For 2008, 2009, and 2010, the percentage of claims that could not have been affected by a payment method at issue were                **REDACTED** respectively (see **Exhibits 2 to 4**).

57. In addition, there is significant variation across states in the likelihood that a putative class member was assigned a contractor who was paid using a uni-price or other flat rate method. As discussed above, for Arizona, California, and Texas in 2007 between    **REDACTED**    of claims were serviced under a uni-price or other flat rate payment method. In contrast, in 2007 for Categories 2, 3, and 4, the weighted average percentages were             **REDACTED**
**REDACTED** , respectively (see **Exhibit 8**). There was significant variation across states in 2008 through 2010 as well (see **Exhibit 8**).

---

[37] Interview with Tim Kaszynski of First American.

58. Within the states in which First American has a smaller presence there also appears to be significant variation in the proportion of claims paid under the bid and valued payment methods.  **Table 2** summarizes the percentage of claims serviced under either the bid or valued payment method by state for states in Category 3.  As can be seen, the likelihood that a claim was serviced by a contractor paid using a payment method at issue varies significantly by state.

**Table 2**[38]

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Alabama | | | | |
| Arkansas | | | | |
| Colorado | | | | |
| Idaho | | | | |
| Illinois | | | | |
| Indiana | | | | |
| Kansas | | | | |
| Kentucky | | | | |
| Louisiana | | | | |
| Maryland | | REDACTED | | |
| Michigan | | | | |
| Mississippi | | | | |
| Missouri | | | | |
| Nebraska | | | | |
| New Jersey | | | | |
| New York | | | | |
| Oklahoma | | | | |
| Oregon | | | | |
| Pennsylvania | | | | |
| South Carolina | | | | |
| Virginia | | | | |
| Washington | | | | |
| West Virginia | | | | |
| Wisconsin | | | | |

Source: Exhibits 1 to 4.

---

[38] Cells that are shaded grey indicate that the state was not in Category 3 for the year of the shaded cell.

21

**Exhibit A**
**Page 26**

E.     **Even if Plaintiff's assertions regarding the effect of uni-price and flat rate pricing were correct, the differences between these payment methodologies are likely important and may create different incentives and conduct**

59. There are three flat rate payment methods used currently or at some time during the putative class period by First American: uni-price/revise uni-price, flat rate, and default.[39] Uni-price contractors, and revised uni-price contractors when that payment method was active, agree to provide service for a set price regardless of the type of job. Flat rate contractors agree to complete a specific type of job for a set rate. Default contractors agree to provide service for First American for a pre-established rate that exceeds the rate set by First American for one or more types of work.[40] For example, one default contractor may accept First American's rates for appliances, but have higher rates for HVAC while another default contractor may charge higher rates across the board. This means that depending on the agreement the default contractor has with First American, the contractor will be paid the same or more than flat rate contractors to perform the same type of work.

60. The differences in payment rates and terms mean that contractors paid under the different methods may face different incentives that could cause their behavior to differ. For example, a flat rate contractor who focuses on HVAC repairs will likely be paid more to work on an HVAC job than a uni-price contractor working on the same job because HVAC repairs tend to have a higher per job cost than the overall average, which would be taken into account when setting the rates for the flat rate contractor.[41] This means that any incentive that may exist for the uni-price contractor to deny the claim because it is an expensive repair may not exist or may be attenuated for the flat rate contractor. Similarly, default contractors would also be paid more than uni-price contractors and possibly even more than flat rate contractors for the same job, which means that, under the Plaintiff's theory, they too may have less of an incentive to deny large claims than a uni-price or possibly a flat rate contractor.

61. Approximately **REDACTED** of claims in November 2007 were serviced by contractors working under a default payment method and **REDACTED** by contractors working under a flat rate payment method. In contrast, approximately **REDACTED** of claims were serviced by

---

[39] Terms, Definitions, and Procedures (FAHB-DIAZ00397 – FAHB-DIAZ00399 at FAHB-DIAZ00397).
[40] Terms, Definitions, and Procedures (FAHB-DIAZ00397 – FAHB-DIAZ00399 at FAHB-DIAZ00397).
[41] First American Home Buyers Protection, Cost Per Claim Report, August 2007, pp. 2-5 (FAHB-DIAZ114867 – FAHB-DIAZ114881 at FAHB-DIAZ114868 – FAHB-DIAZ114871).

*Confidential*

contractors working under a uni-price or revised uni-price contract during the month.[42]  Over the whole year in 2007, approximately **REDACTED** of claims were serviced by contractors working under a default payment method and **REDACTED** by contractors working under a flat rate payment method.  In contrast, approximately **REDACTED** of claims were serviced by contractors working under a uni-price or revised uni-price contract (see **Exhibit 1**).  In summary, Dr. Kennedy's analysis of the incentives faced by contractors is incomplete and misleading.  He fails to consider the full range of incentives faced by contractors and that a flat rate system may be the most economically efficient method to compensate contractors.  He also fails to consider that the incentives may vary by payment method and that the prevalence of payment methods varies by location.  For example, a home owner in states in Categories 3 or 4 was more likely than not in 2007 or 2008 to have been serviced by a contractor paid on a time and material basis than one compensated under a flat rate payment method while in Arizona only approximately **REDACTED** of claims were serviced by contractor paid on a time and material basis (see **Exhibits 1 and 5**).  Dr. Kennedy also fails to consider that changes in the market, such as the unprecedented decline in the housing market in 2008, or contractor's own cost structure may affect the incentives faced by contractors.

Submitted on June 15, 2011

Bruce A. Strombom, Ph.D.
Los Angeles, California

---

[42] Year over year Average Cost Analysis, Nov 2006 vs. Nov 2007 (FAHB-DIAZ114897 – FAHB-DIAZ114905 at FAHB-DIAZ114905).

23

Confidential

# Appendix A

## BRUCE A. STROMBOM, Ph.D.
### Managing Principal

Phone: (213) 896-4520                                                     333 S. Hope Street
Fax: (213) 623-4112                                                              Suite 2700
bstrombom@analysisgroup.com                                Los Angeles, CA  90071

Bruce Strombom is an expert in applied microeconomics, industrial organization and finance.  He specializes in the estimation of commercial damages, quantitative and statistical analysis, the valuation of privately held companies and the health care industry.  He provides assistance to attorneys in all phases of pretrial and trial practice, prepares economic and financial models, and provides expert testimony in litigation and public policy matters.  Dr. Strombom has conducted assessments of class certification, liability and damages issues in cases involving antitrust, false advertising, intellectual property, labor and employment, real estate, securities, product defects and general commercial disputes.

Prior to joining Analysis Group, Dr. Strombom was Executive Vice President of a middle-market merger and acquisition firm, where he managed a financial and market research organization that provided valuation services to over 500 privately held companies annually.  Previously, he was Consulting Manager at Price Waterhouse, where he provided litigation support and value enhancement consulting services, and Senior Financial Analyst at the Tribune Company, where he evaluated capital projects and acquisition candidates.  Dr. Strombom holds a Ph.D. in economics from the University of California, Irvine, and a B.A. in economics from San Jose State University.

### EDUCATION

| | |
|---|---|
| Ph.D. | Economics, University of California, Irvine<br>Fields: Finance and Industrial Organization<br>Thesis: Switching Cost, Price Sensitivity and Health Plan Choice |
| B.A. | Economics, San Jose State University, San Jose, CA |

### PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 – Present | Managing Principal, Analysis Group, Inc., Los Angeles, CA |
| 1993 – 2004 | Senior Associate and Vice President, Analysis Group, Inc., Los Angeles, CA |
| 1992 | Regional General Manager, Prodata, Inc., Sacramento, CA |
| 1985 – 1991 | Executive Vice President, Geneva Business Research Corp., Irvine, CA |
| 1983 – 1985 | Manager of Consulting Services, Price Waterhouse, Newport Beach, CA |
| 1981 – 1983 | Senior Financial Analyst, Tribune Newspapers West, Woodland Hills, CA |

**SELECT CASE ASSIGNMENTS**

- **SOC-SMG Inc. v. Day & Zimmermann, Inc.**
  *Arbitration Before JAMS*
  Calculate the amount of overpayment in a joint venture transaction caused by misrepresentations and non-disclosure of material adverse events (expert report and testimony at arbitration).

- **In re General Motors OnStar Litigation**
  *United States District Court, Eastern District of Michigan*
  Assess whether common proof exists of injury to all members of the putative class and whether damages can be calculated on a class-wide basis without individual inquiry (expert report and deposition).

- **David Salomon v. Michael Gould et al.**
  *Arbitration before JAMS*
  Review two competing valuations of a securities trading firm engaged in arbitrage in exchange-listed equities, fixed-income products and derivatives using proprietary algorithms and electronic trade execution software (testimony at arbitration).

- **Confidential Assignment – Residential Mortgage Portfolio Valuation**
  Value a multi-billion dollar portfolio of first and second lien residential mortgages for tax purposes.

- **Denise P. Edwards v. First American Corporation, et al.**
  *United States District Court, Central District of California*
  Evaluate whether damages to members of the proposed class can be determined using a common method of proof without individual inquiry and estimate the fair market value of minority interests in ten title insurance agencies in this case involving the claimed violation of RESPA (expert reports).

- **State Pipe and Supply, Inc. v. Coutinho & Ferrostal Inc.**
  *United States District Court, Central District of California*
  Calculate damages (a) to the plaintiff from the failure of a steel pipe supplier to deliver products as contracted and (b) to the defendant under a counter-claim assuming proper mitigation (expert report).

- **Hansen Beverage Company v. Vital Pharmaceuticals, Inc.**
  *United States District Court, Southern District of California*
  Evaluate damages under the Lanham Act from alleged false advertising in the energy drink and energy shot markets (expert report and deposition).

- **Beverly Kanawi, et al. v. Bechtel Corporation**
  *United States District Court, Central District of California*
  Case team leader in rebutting analyses of seven opposing experts in ERISA case involving claims that 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent.

- **In re: Washington Mutual, Inc., et al.**
  *United States Bankruptcy Court, District of Delaware*
  Supported Academic Affiliate in preparing expert report addressing whether securities known as litigation tracking warrants (LTWs) were debt or equity instruments.

- **MVU Investors LLC v. General Electric Corporation**
  *United States District Court, Central District of California*
  Estimate damages from the alleged breach of an agreement to purchase a patent portfolio involving MRI technology (expert report).

- **Larry Plancich v. United Parcel Service, Inc.**
  *Superior Court of California, County of San Bernardino (testimony at trial)*
  **Ben Lopez v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
  **Daniel Kline v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
  **Gerald Shoemaker v. United Parcel Service, Inc.**
  *United States District Court, District of Idaho (declaration)*
  Analyze time records to determine whether the FLSA Motor Carrier Exemption applied in these wage and hour matters.

- **Rajashree Karwa v. Madison Tyler Holdings, LLC**
  *Arbitration Before JAMS*
  Rebut damages claimed by plaintiff related to her termination and removal as a management member of Madison Tyler Holdings without sufficient cause (expert report and deposition).

- **Daniel Perez et al. v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Arizona*
  Draw and evaluate a sample of title insurance policy files to determine the frequency of mispricing and assess whether damages can be caluculated on a class-wide basis without individual inquiry (expert report and deposition).

- **Confidential Assignment – Residential Mortgage Underwriting Standards**
  Evaluate the impact on minority borrowers of changes in the residential mortgage underwriting standards of a large mortgage lender intended to address falling residential real estate values.

- **Joan Ned-Sthran v. Methodist Hospitals of Dallas et al.**
  *United States District Court, Northern District of Texas*
  Evaluate claims of breach of fiduciary duty and damages in ERISA case involving alleged excessive charges for employees' share of health insurance premiums (expert report).

- **Oncure Medical Corporation v. Mission Hospital Regional Medical Center**
  *Superior Court of California, County of Orange*
  Estimate damages suffered by a radiation therapy provider from the breach of a noncompete agreement and provide assistance in mediation.

- **Classic Concepts v. Linen Source, Inc.**
  *United States District Court, Central District of California*
  Estimate damages related to a claim of copyright infringement (expert report and testimony at trial).

- **Vitascan Partners v. G.E. Healthcare Financial Services**
  *Superior Court of California, County of Santa Barbara*
  Evaluate claims that poor performance of EBT scanners caused the failure of plaintiffs' business and estimate damages (deposition and testimony at trial).

26

- **New World TMT, Ltd. v. PrediWave Corp., et al.**
  *Superior Court of California, County of Santa Clara*
  Evaluate prices of SDRAM chips and calculate damages from investments, purchases and advances made by New World when a cable television venture in China failed (expert report and deposition).

- **Johnette C. Alexander et al. v. Kia Motors America, Inc. et al.**
  *Superior Court of California, County of Orange*
  Assess damages suffered by class members caused by alleged defective rear seat belt systems in the Kia Sephia (deposition and testimony at trial).

- **Raffone v. First American Title Insurance Company, Inc.**
  *Circuit Court, Nassau County, Florida*
  Assess the feasibility of using the company's electronic data to determine whether consumers were entitled to, but did not receive, discounted prices on a class-wide basis (expert report).

- **Confidential Assignment - Predatory Mortgage Lending**
  Consulting assignment involved the analysis of the loan pricing, underwriting and sales practices of a major subprime mortgage originator to evaluate claims of predatory lending.

- **Nevada Attorney General - Health Plan Merger**
  Retained by a state attorney general to prepare an expert report and testify concerning market definition and the impact of a proposed health plan merger on competition in health insurance markets. Evaluate possible monopsony power in the market for physician services.

- **Memory Card International v. Fry's Electronics, Inc., et al.**
  *California Superior Court, County of Orange*
  Estimate damages caused by alleged misappropriation of trade secrets related to computer memory devices (expert report).

- **In re September 11 Litigation**
  *United States District Court, Southern District of New York*
  Led a case team that supported Academic Affiliate in calculating damages to the 99-year master leasehold interests held by Silverstein Properties from destruction of World Trade Center Towers One, Two, Four and Five on 9/11.

- **Fredrick W. Penney et al. v. CLC, Inc.**
  *Arbitration before JAMS*
  Estimate damages suffered by law firms from failure of a prepaid legal services plan to refer members to contracted legal network (deposition and testimony at arbitration).

- **EMC Mortgage Corporation v. Ameriquest Mortgage Corporation**
  *District Court of Denton County, Texas 16th Judicial District*
  Support Academic Affiliate in preparing expert report analyzing how trends in residential real estate prices, loan repurchase obligations and developments in the securities markets interacted to force the closure of many subprime lenders.

- **Sunset Drive Corporation v. City of Redlands**
  *United States District Court, Central District of California*
  Prepare financial projections and estimate damages suffered by a developer when defendant blocked construction of a low to moderate income residential development (expert report and deposition).

*Confidential*

- **In re Managed Care**
  *United States District Court, Southern District of Florida*
  Provide expert support to a large commercial health plan in a dispute involving claims adjudication practices, including the use of automated claims review and editing software, and prepare detailed analyses of over 100 million fee-for-service claims.

- **First American Corporation**
  Led several assignments including preparation of expert reports evaluating competition in markets for title insurance and real estate closing services, assessing variation in real estate conveyance practices across markets and evaluating proposed changes in title insurance regulation.

- **Conrad P. Lee Company, et al. v. EPS Solutions Corp., et al.**
  *Arbitration before JAMS*
  Evaluate factors leading to the failure of a professional services firm, value five privately held companies and estimate damages resulting from non-disclosures in a roll-up transaction (expert reports, deposition and testimony at arbitration).

- **Marshall Hospital v. Eliot R. Drell, M.D., et al.**
  *Arbitration before JAMS*
  Estimate the value of an Ambulatory Surgery Center and calculate lost profits from termination of a joint venture between a hospital and medical group (deposition and testimony at arbitration).

- **City of Los Angeles**
  *Consent Decree with U.S. Department of Justice*
  Evaluate claims of racial profiling by LAPD officers using advanced statistical techniques and data on motor vehicle and pedestrian stops (expert report).

- **In re Quanex Corporation and Affiliated Subsidiaries**
  *United States Tax Court*
  Assess the economic substance and business purpose of a transaction establishing a special purpose subsidiary (expert report and testimony at trial).

- **California State Auditor**
  Several assignments including a) review of the financial status and future prospects of the Los Angeles County Department of Health Services b) evaluation of the merger of UCSF Medical Center and Stanford Health Services to access the economic rationale and determine the benefits of integration and c) review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Peter Vagenas, et al. v. Demetrios Kefallinos, et al.**
  *Arbitration before ADR Services, Inc.*
  Value a fast-food restaurant chain, rebut plaintiffs' damages analysis and estimate damages from alleged infringement of trademark/trade dress (deposition and testimony at arbitration).

- **Health Net, Inc. v. State Department of Health Services, et al.**
  *Superior Court of California, County of Sacramento*
  Estimate damages suffered by Health Net from the State's failure to properly allocate MediCal managed care enrollees to the health plan (deposition).

28

*Confidential*

- **Regina Little et al. v. Kia Motors America, Inc. et al.**
  *Superior Court of New Jersey – Law Division Union County (expert report and testimony at trial);*
- **Maria Santiago, et al. v. Kia Motors America, Inc. et al.**
  *Superior Court of California, County of Orange (deposition); and*
- **Shamell Samuel-Bassett, et al. v. Kia Motors America, Inc. et al.**
  *Pennsylvania Court of Common Pleas, Philadelphia County (expert report and testimony at trial)*
  Estimate excess depreciation of vehicle and other damages suffered by class member as the result of an allegedly defective braking system in the Kia Sephia.

- **Microsoft Corp. – Private Antitrust Litigations**
  Consulting support to counsel related to potential overcharges from anticompetitive conduct in markets for PC operating system and application software. Estimated damages exposure in an antitrust action brought by Netscape for alleged anticompetitive conduct in the market for internet browsers.

- **Pacific Coin Management v. BR Telephony Partners, et al.**
  *California Superior Court, County of Los Angeles*
  Estimate damages suffered by the buyer of a pay telephone company from the seller's failure to disclose information allegedly pertinent to the value of the company (expert report, deposition and testimony at trial).

- **Campbell v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Maine*
  Evaluate class certification issues and review the statistical sampling method used by plaintiffs' expert to estimate the frequency of overcharges for title insuance policies issued in refinance transactions (expert report).

- **Bell and Associates, Inc. v. Fidelity National Information Solutions, Inc., et al.**
  *Superior Court of California, County of Orange*
  Estimate damages caused by the breach of a joint venture agreement in a start-up internet-based business enterprise (expert report and deposition).

- **Janice Millius et al. v. Los Angeles Unified School District**
  *Superior Court of California, County of Los Angeles*
  In this case seeking recovery of unpaid wages and benefits, calculated the difference in cost between bus service provided by district employees and service provided by independent third party vendors (expert report).

- **John Muir Medical Center v. Health Net, Inc.**
  *Arbitration before JAMS*
  Evaluate whether inflation in hospital charges exceeded the amount allowed in a provider services contract (deposition).

- **Sutter Health v. Health Net, Inc.**
  *American Arbitration Association*
  Assess the reasonableness of a hospital's billed charges during contract negotiations with a health plan (expert report and testimony at arbitration).

- **Horowitz Limited Partnership I v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert report and testimony at arbitration);*

29

- **James Holden and Christine Holden v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration); and*

- **Victor Arias, et al. v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration)*
  Assess loss causation issues, value eight privately held companies and estimate damages resulting from non-disclosures in a roll-up transaction involving over thirty professional service companies.

- **Mark Ford et al. v. Bimbo Bakeries USA, Inc., et al.**
  *Superior Court of California, County of Los Angeles*
  Estimate damages suffered by independent distributors in a contract dispute with a large commercial bakery (deposition).

- **Impact Management Consulting v. National Scrip Center**
  *Arbitration before JAMS*
  Estimate lost profits from the breach of an exclusive marketing agreement (expert report).

- **Robert Kahn v. Financial Management Advisors, Inc.**
  *Arbitration before JAMS*
  Evaluate the equivalence of shares in an S-corporation with membership units in a majority owned subsidiary limited liability corporation (expert report and testimony at arbitration).

- **Kan Di Ki, Inc. v. Timothy B. Ferrigan, et al.**
  *Superior Court of California, County of Fresno*
  Estimate damages from breach of a non-solicitation agreement associated with the sale of a mobile radiology company (expert report and deposition).

- **Gary M. Kawesch, M.D. Inc. v. Antione L. Garabet, M.D., Inc., et al.**
  *United States District Court, Northern District of California*
  Estimate damages resulting from trademark/trade dress infringement by a laser eye surgery provider (expert reports).

- **Consumer Justice Center, et al. v. Brother Industries, Inc., et al.**
  *Superior Court of California, County of Orange*
  Develop, implement and analyze a consumer survey to determine whether product advertising misled consumers about product features.

- **In re the Marriage of Downey**
  *California Superior Court, County of Orange*
  Value a manufacturer of commercial and general aviation aircraft cabin interior products (expert report and deposition).

- **Western Filter Corporation v. Vickers Inc.**
  *United States District Court, Central District of California*
  Assess damages resulting from the breach of an alliance agreement involving the sales and marketing of industrial hydraulic equipment (expert report and testimony at arbitration).

30

*Confidential*

- **California Food Plan, Inc. v. Robert Size, et al.**
  *California Superior Court, County of Orange*
  Value a direct marketing food retailer and analyze alleged excess compensation under consulting agreement (expert report and deposition).

- **SEC v. Henry Yuen, et al.**
  *United States District Court, Central District of California, Western Division*
  Provide consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- **Ticketmaster LLC v. StubHub, Inc.**
  *Superior Court of California, County of Los Angeles*
  Retained by defendant to evaluate damages from the sale of blocks of "artist hold tickets" on StubHub's internet-based marketplace.

- **Unilab Corporation v. Westcliff Medical Laboratories**
  *California Superior Court, County of Los Angeles*
  Estimate damages associated with the acquisition of a medical testing laboratory.

- **The Commissioner of Corporations of the State of California v. Western Dental Services, Inc.**
  *California Superior Court, County of Orange*
  Support Academic Affiliate in evaluating the statistical sampling methodology used by the Department of Corporations to assess dental service quality.

- **Chinyun Kim v. The Grover Coors Trust, et al.**
  *District Court, Jefferson County, Colorado*
  Provide analytic support to an Academic Affiliate in the valuation of convertible preferred stock in a financial distressed packaging materials manufacturer.

- **In re: FedEx Ground Package System, Inc., Employment Practices Litigation**
  *United States District Court, Northern District of Indiana*
  In this case involving the alleged misclassification of drivers as independent contractors, led case team supporting two Academic Affiliates who analyzed the functions performed by FedEx drivers, the economic relationships between FedEx, the drivers and customers of FedEx, and transactions involving the sale of routes by drivers.

- **Eagle Real Estate Group, LLC et al., v. Kenneth R. Melton, et al.**
  *Superior Court of California, County of Orange*
  Support Academic Affiliate in the valuation of multifamily residential properties and estimation of damages resulting from breach of a partnership agreement.

- **MedImmune, Inc., v. Centocor, Inc., et al.**
  *United States District Court, District of Maryland*
  Support an Academic Affiliate in evaluating whether the monoclonal antibody product, Synagis, was commercially successful and whether the patented technology at issue contributed to that success.

- **Gray v. ODS Technology, LP, et al.**
  *United States District Court, Southern District of Florida*
  Value an option to acquire an equity interest in an internet gaming enterprise.

31

**Exhibit A**
**Page 36**

- **Cost Shifting in Hospital Services**
  For a consortium of community hospitals, compare hospital reimbursement rates paid by government payers (Medicare, Medicaid and County Indigent Programs) with those paid by commercial health plans and estimate the impact of "cost shifting" on health plan premiums and enrollment.

- **Wichita Clinic, P.A., v. Columbia/HCA Healthcare Corporation**
  *United States District Court, District of Kansas*
  Support Academic Affiliate in economic analysis and evaluation of the alleged monopolization of hospital services market.

- **Edison Electric Institute**
  Prepare a white paper on the use of derivative securities to hedge risk in the electric utility industry.

## SELECTED PAPERS AND PRESENTATIONS

"Statistical Analyses in Proactive Audits and Employment Litigation," presented at a Webinar continuing education forum for attorneys sponsored by Analysis Group, Inc. May 20, 2009.

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a Webinar continuing education forum for attorneys sponsored by Analysis Group, Inc., July 29, 2008

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a continuing education forum for attorneys sponsored by Analysis Group, Inc., June 24, 2008, San Francisco, CA.

"Subprime Litigation: A Survival Guide," presented at Institutional Investor Legal Forum Summer Roundtable, June 18, 2008, Santa Monica, CA.

"Subprime Lending Litigation," Program Co-chair at a continuing education forum for attorneys sponsored by CLE International, May 8 and 9, 2008, Los Angeles, CA.

"Reductions in Force: Strategies to Minimize Litigation Risk in Downsizing," presented at a continuing education forum for attorneys sponsored by K&L Gates, January 17, 2008, New York, NY.

"Investigation of Racial Profiling by the LAPD – Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," City of Los Angeles, July 2006.

"An Assessment of Competition in California Title Insurance and Escrow Markets," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Competition and Title Insurance Rates in California," with Bruce Stangle, report prepared for First American Title Insurance Company, January 23, 2006.

"Competition and Title Insurance Prices in California," report and presentation to the National Association of Insurance Commissioners (NAIC), Title Insurance Working Group, June 2006, Washington DC.

"Switching Cost, Price Sensitivity and Health Plan Choice," *Journal of Health Economics* 21, January 2002, p. 89-116.

"Risk Selection Caused by the Correlation of Health Status and Sensitivity to Price," Research in Health Care Financial Management Symposium, August 2001, Best Research Paper Award.

"Do Firms That Repurchase Their Own Shares Earn Abnormal Returns?" Analysis Group/Economics, Working Paper, December 1999.

"Health Status and Consumers' Willingness to Switch Health Plans," American Public Health Association, Annual Meeting, October 1999, Chicago, IL.

"Risk Selection in a Setting of Managed Competition," Western Economics Association, Annual Conference, July 1999, San Diego, CA.

"Form of Ownership and the Exit Decision, Hospital Closures in California," UC Irvine, Department of Economics, Working Paper, February 1998.

"Policy Options for Reducing Growth in Medicaid Spending for Long-term Care Services," Pfizer, Inc., Health Care Legislation Conference, May 1997, Irvine, CA.

"Regulation of Provider Networks that Bear Insurance Risk," Health Care in Louisiana: Issues and Answers, January 1997.

## Appendix B
### Documents Considered
#### Emily Diaz v. First American Home Buyers Protection Corporation

**Bates Stamped Documents**

| Beginning Bates | Ending Bates |
| --- | --- |
| ED 00084 | ED 00085 |
| Orange Coast 035 | Orange Coast 035 |
| FAHB-DIAZ00382 | FAHB-DIAZ00387 |
| FAHB-DIAZ00388 | FAHB-DIAZ00388 |
| FAHB-DIAZ00389 | FAHB-DIAZ00390 |
| FAHB-DIAZ00391 | FAHB-DIAZ00396 |
| FAHB-DIAZ00397 | FAHB-DIAZ00399 |
| FAHB-DIAZ00397 | FAHB-DIAZ00399 |
| FAHB-DIAZ00417 | FAHB-DIAZ00417 |
| FAHB-DIAZ00418 | FAHB-DIAZ00418 |
| FAHB-DIAZ00453 | FAHB-DIAZ00454 |
| FAHB-DIAZ00455 | FAHB-DIAZ00456 |
| FAHB-DIAZ00457 | FAHB-DIAZ00457 |
| FAHB-DIAZ00601 | FAHB-DIAZ00601 |
| FAHB-DIAZ00602 | FAHB-DIAZ00602 |
| FAHB-DIAZ00603 | FAHB-DIAZ00603 |
| FAHB-DIAZ00604 | FAHB-DIAZ00604 |
| FAHB-DIAZ00605 | FAHB-DIAZ00605 |
| FAHB-DIAZ00606 | FAHB-DIAZ00606 |
| FAHB-DIAZ02256 | FAHB-DIAZ02294 |
| FAHB-DIAZ03668 | FAHB-DIAZ03694 |
| FAHB-DIAZ12799 | FAHB-DIAZ12825 |
| FAHB-DIAZ15800 | FAHB-DIAZ15804 |
| FAHB-DIAZ17579 | FAHB-DIAZ17609 |
| FAHB-DIAZ18596 | FAHB-DIAZ18723 |
| FAHB-DIAZ031712 | FAHB-DIAZ031713 |
| FAHB-DIAZ031722 | FAHB-DIAZ031723 |
| FAHB-DIAZ031724 | FAHB-DIAZ031725 |
| FAHB-DIAZ031726 | FAHB-DIAZ031727 |
| FAHB-DIAZ031728 | FAHB-DIAZ031732 |
| FAHB-DIAZ031747 | FAHB-DIAZ031748 |
| FAHB-DIAZ031835 | FAHB-DIAZ031835 |
| FAHB-DIAZ031836 | FAHB-DIAZ031838 |
| FAHB-DIAZ031839 | FAHB-DIAZ031840 |
| FAHB-DIAZ031845 | FAHB-DIAZ031845 |
| FAHB-DIAZ031846 | FAHB-DIAZ031846 |
| FAHB-DIAZ031847 | FAHB-DIAZ031848 |
| FAHB-DIAZ031849 | FAHB-DIAZ031849 |
| FAHB-DIAZ031850 | FAHB-DIAZ031850 |
| FAHB-DIAZ034116 | FAHB-DIAZ034116 |
| FAHB-DIAZ034117 | FAHB-DIAZ034119 |
| FAHB-DIAZ034966 | FAHB-DIAZ034967 |
| FAHB-DIAZ034991 | FAHB-DIAZ034993 |
| FAHB-DIAZ035152 | FAHB-DIAZ035153 |
| FAHB-DIAZ035242 | FAHB-DIAZ035243 |
| FAHB-DIAZ035245 | FAHB-DIAZ035248 |
| FAHB-DIAZ036045 | FAHB-DIAZ036046 |
| FAHB-DIAZ036509 | FAHB-DIAZ036509 |
| FAHB-DIAZ036586 | FAHB-DIAZ036587 |
| FAHB-DIAZ037791 | FAHB-DIAZ037792 |
| FAHB-DIAZ037808 | FAHB-DIAZ037809 |

ANALYSIS GROUP, INC.

**Exhibit A
Page 39**

## Appendix B
### Documents Considered
### Emily Diaz v. First American Home Buyers Protection Corporation

| | |
|---|---|
| FAHB-DIAZ037820 | FAHB-DIAZ037821 |
| FAHB-DIAZ037831 | FAHB-DIAZ037831 |
| FAHB-DIAZ037832 | FAHB-DIAZ037832 |
| FAHB-DIAZ038229 | FAHB-DIAZ038231 |
| FAHB-DIAZ038646 | FAHB-DIAZ038647 |
| FAHB-DIAZ038722 | FAHB-DIAZ038724 |
| FAHB-DIAZ039218 | FAHB-DIAZ039218 |
| FAHB-DIAZ039237 | FAHB-DIAZ039241 |
| FAHB-DIAZ039266 | FAHB-DIAZ039272 |
| FAHB-DIAZ039385 | FAHB-DIAZ039391 |
| FAHB-DIAZ039482 | FAHB-DIAZ039482 |
| FAHB-DIAZ039483 | FAHB-DIAZ039483 |
| FAHB-DIAZ039497 | FAHB-DIAZ039497 |
| FAHB-DIAZ039741 | FAHB-DIAZ039742 |
| FAHB-DIAZ039756 | FAHB-DIAZ039761 |
| FAHB-DIAZ039954 | FAHB-DIAZ039956 |
| FAHB-DIAZ040069 | FAHB-DIAZ040070 |
| FAHB-DIAZ040095 | FAHB-DIAZ040095 |
| FAHB-DIAZ040112 | FAHB-DIAZ040112 |
| FAHB-DIAZ040131 | FAHB-DIAZ040131 |
| FAHB-DIAZ040137 | FAHB-DIAZ040141 |
| FAHB-DIAZ040159 | FAHB-DIAZ040159 |
| FAHB-DIAZ040329 | FAHB-DIAZ040329 |
| FAHB-DIAZ040362 | FAHB-DIAZ040364 |
| FAHB-DIAZ040519 | FAHB-DIAZ040520 |
| FAHB-DIAZ040768 | FAHB-DIAZ040768 |
| FAHB-DIAZ040769 | FAHB-DIAZ040902 |
| FAHB-DIAZ040915 | FAHB-DIAZ040915 |
| FAHB-DIAZ043295 | FAHB-DIAZ043296 |
| FAHB-DIAZ043723 | FAHB-DIAZ043725 |
| FAHB-DIAZ043802 | FAHB-DIAZ043804 |
| FAHB-DIAZ043805 | FAHB-DIAZ043807 |
| FAHB-DIAZ043808 | FAHB-DIAZ043810 |
| FAHB-DIAZ043811 | FAHB-DIAZ043813 |
| FAHB-DIAZ045418 | FAHB-DIAZ045422 |
| FAHB-DIAZ045868 | FAHB-DIAZ045868 |
| FAHB-DIAZ045869 | FAHB-DIAZ045870 |
| FAHB-DIAZ045871 | FAHB-DIAZ045871 |
| FAHB-DIAZ046086 | FAHB-DIAZ046087 |
| FAHB-DIAZ046375 | FAHB-DIAZ046376 |
| FAHB-DIAZ046385 | FAHB-DIAZ046385 |
| FAHB-DIAZ046386 | FAHB-DIAZ046476 |
| FAHB-DIAZ046851 | FAHB-DIAZ046852 |
| FAHB-DIAZ046867 | FAHB-DIAZ046870 |
| FAHB-DIAZ046871 | FAHB-DIAZ046874 |
| FAHB-DIAZ046875 | FAHB-DIAZ046877 |
| FAHB-DIAZ046893 | FAHB-DIAZ046893 |
| FAHB-DIAZ046894 | FAHB-DIAZ046895 |
| FAHB-DIAZ046896 | FAHB-DIAZ046897 |
| FAHB-DIAZ047087 | FAHB-DIAZ047088 |
| FAHB-DIAZ047089 | FAHB-DIAZ047090 |
| FAHB-DIAZ047096 | FAHB-DIAZ047097 |
| FAHB-DIAZ048703 | FAHB-DIAZ048703 |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 40**

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

| | |
|---|---|
| FAHB-DIAZ048704 | FAHB-DIAZ048705 |
| FAHB-DIAZ048706 | FAHB-DIAZ048707 |
| FAHB-DIAZ048708 | FAHB-DIAZ048709 |
| FAHB-DIAZ048710 | FAHB-DIAZ048710 |
| FAHB-DIAZ049244 | FAHB-DIAZ049244 |
| FAHB-DIAZ049251 | FAHB-DIAZ049252 |
| FAHB-DIAZ049253 | FAHB-DIAZ049254 |
| FAHB-DIAZ049255 | FAHB-DIAZ049256 |
| FAHB-DIAZ049257 | FAHB-DIAZ049258 |
| FAHB-DIAZ049259 | FAHB-DIAZ049259 |
| FAHB-DIAZ049260 | FAHB-DIAZ049260 |
| FAHB-DIAZ049261 | FAHB-DIAZ049288 |
| FAHB-DIAZ051239 | FAHB-DIAZ051239 |
| FAHB-DIAZ051240 | FAHB-DIAZ051241 |
| FAHB-DIAZ053241 | FAHB-DIAZ053241 |
| FAHB-DIAZ053264 | FAHB-DIAZ053267 |
| FAHB-DIAZ053268 | FAHB-DIAZ053269 |
| FAHB-DIAZ053702 | FAHB-DIAZ053704 |
| FAHB-DIAZ053708 | FAHB-DIAZ053710 |
| FAHB-DIAZ053717 | FAHB-DIAZ053721 |
| FAHB-DIAZ053722 | FAHB-DIAZ053726 |
| FAHB-DIAZ054265 | FAHB-DIAZ054272 |
| FAHB-DIAZ055100 | FAHB-DIAZ055100 |
| FAHB-DIAZ056956 | FAHB-DIAZ056957 |
| FAHB-DIAZ056965 | FAHB-DIAZ056965 |
| FAHB-DIAZ056966 | FAHB-DIAZ056969 |
| FAHB-DIAZ057111 | FAHB-DIAZ057115 |
| FAHB-DIAZ057136 | FAHB-DIAZ057136 |
| FAHB-DIAZ057618 | FAHB-DIAZ057618 |
| FAHB-DIAZ057625 | FAHB-DIAZ057625 |
| FAHB-DIAZ057647 | FAHB-DIAZ057648 |
| FAHB-DIAZ057663 | FAHB-DIAZ057666 |
| FAHB-DIAZ057671 | FAHB-DIAZ057675 |
| FAHB-DIAZ058665 | FAHB-DIAZ058665 |
| FAHB-DIAZ059892 | FAHB-DIAZ059892 |
| FAHB-DIAZ059893 | FAHB-DIAZ061835 |
| FAHB-DIAZ061837 | FAHB-DIAZ061840 |
| FAHB-DIAZ061841 | FAHB-DIAZ061841 |
| FAHB-DIAZ061842 | FAHB-DIAZ061842 |
| FAHB-DIAZ067408 | FAHB-DIAZ067410 |
| FAHB-DIAZ068054 | FAHB-DIAZ068054 |
| FAHB-DIAZ068602 | FAHB-DIAZ068603 |
| FAHB-DIAZ068604 | FAHB-DIAZ068605 |
| FAHB-DIAZ068611 | FAHB-DIAZ068611 |
| FAHB-DIAZ068612 | FAHB-DIAZ068612 |
| FAHB-DIAZ068613 | FAHB-DIAZ068614 |
| FAHB-DIAZ068678 | FAHB-DIAZ068678 |
| FAHB-DIAZ068679 | FAHB-DIAZ068686 |
| FAHB-DIAZ069057 | FAHB-DIAZ069060 |
| FAHB-DIAZ069079 | FAHB-DIAZ069079 |
| FAHB-DIAZ069080 | FAHB-DIAZ069084 |
| FAHB-DIAZ069085 | FAHB-DIAZ069085 |
| FAHB-DIAZ069086 | FAHB-DIAZ069090 |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 41**

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

| | |
|---|---|
| FAHB-DIAZ069091 | FAHB-DIAZ069094 |
| FAHB-DIAZ069104 | FAHB-DIAZ069104 |
| FAHB-DIAZ069105 | FAHB-DIAZ069116 |
| FAHB-DIAZ069149 | FAHB-DIAZ069149 |
| FAHB-DIAZ069150 | FAHB-DIAZ069177 |
| FAHB-DIAZ069292 | FAHB-DIAZ069292 |
| FAHB-DIAZ069295 | FAHB-DIAZ069296 |
| FAHB-DIAZ069308 | FAHB-DIAZ069308 |
| FAHB-DIAZ069414 | FAHB-DIAZ069416 |
| FAHB-DIAZ069431 | FAHB-DIAZ069432 |
| FAHB-DIAZ069464 | FAHB-DIAZ069464 |
| FAHB-DIAZ069465 | FAHB-DIAZ069504 |
| FAHB-DIAZ069613 | FAHB-DIAZ069613 |
| FAHB-DIAZ069614 | FAHB-DIAZ069620 |
| FAHB-DIAZ069636 | FAHB-DIAZ069636 |
| FAHB-DIAZ069637 | FAHB-DIAZ069649 |
| FAHB-DIAZ069774 | FAHB-DIAZ069774 |
| FAHB-DIAZ069775 | FAHB-DIAZ069775 |
| FAHB-DIAZ070326 | FAHB-DIAZ070326 |
| FAHB-DIAZ070327 | FAHB-DIAZ070333 |
| FAHB-DIAZ070356 | FAHB-DIAZ070356 |
| FAHB-DIAZ070357 | FAHB-DIAZ070363 |
| FAHB-DIAZ070936 | FAHB-DIAZ070936 |
| FAHB-DIAZ070937 | FAHB-DIAZ070950 |
| FAHB-DIAZ070951 | FAHB-DIAZ070957 |
| FAHB-DIAZ070958 | FAHB-DIAZ070970 |
| FAHB-DIAZ070971 | FAHB-DIAZ070982 |
| FAHB-DIAZ070983 | FAHB-DIAZ070984 |
| FAHB-DIAZ071163 | FAHB-DIAZ071163 |
| FAHB-DIAZ071179 | FAHB-DIAZ071179 |
| FAHB-DIAZ071180 | FAHB-DIAZ071196 |
| FAHB-DIAZ071223 | FAHB-DIAZ071224 |
| FAHB-DIAZ071299 | FAHB-DIAZ071299 |
| FAHB-DIAZ071300 | FAHB-DIAZ071314 |
| FAHB-DIAZ071324 | FAHB-DIAZ071325 |
| FAHB-DIAZ071329 | FAHB-DIAZ071335 |
| FAHB-DIAZ071389 | FAHB-DIAZ071394 |
| FAHB-DIAZ071612 | FAHB-DIAZ071612 |
| FAHB-DIAZ072006 | FAHB-DIAZ072013 |
| FAHB-DIAZ072035 | FAHB-DIAZ072035 |
| FAHB-DIAZ072045 | FAHB-DIAZ072046 |
| FAHB-DIAZ072047 | FAHB-DIAZ072048 |
| FAHB-DIAZ072110 | FAHB-DIAZ072111 |
| FAHB-DIAZ072112 | FAHB-DIAZ072112 |
| FAHB-DIAZ072113 | FAHB-DIAZ072135 |
| FAHB-DIAZ072136 | FAHB-DIAZ072136 |
| FAHB-DIAZ072137 | FAHB-DIAZ072148 |
| FAHB-DIAZ072149 | FAHB-DIAZ072149 |
| FAHB-DIAZ072150 | FAHB-DIAZ072153 |
| FAHB-DIAZ072154 | FAHB-DIAZ072154 |
| FAHB-DIAZ072155 | FAHB-DIAZ072300 |
| FAHB-DIAZ072352 | FAHB-DIAZ072352 |
| FAHB-DIAZ072781 | FAHB-DIAZ072781 |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 42**

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

| | |
|---|---|
| FAHB-DIAZ072782 | FAHB-DIAZ072788 |
| FAHB-DIAZ073022 | FAHB-DIAZ073022 |
| FAHB-DIAZ073023 | FAHB-DIAZ073033 |
| FAHB-DIAZ073067 | FAHB-DIAZ073067 |
| FAHB-DIAZ073135 | FAHB-DIAZ073142 |
| FAHB-DIAZ073143 | FAHB-DIAZ073150 |
| FAHB-DIAZ073316 | FAHB-DIAZ073316 |
| FAHB-DIAZ073317 | FAHB-DIAZ073330 |
| FAHB-DIAZ073331 | FAHB-DIAZ073333 |
| FAHB-DIAZ073344 | FAHB-DIAZ073345 |
| FAHB-DIAZ073350 | FAHB-DIAZ073350 |
| FAHB-DIAZ073351 | FAHB-DIAZ073351 |
| FAHB-DIAZ073374 | FAHB-DIAZ073377 |
| FAHB-DIAZ073382 | FAHB-DIAZ073383 |
| FAHB-DIAZ073384 | FAHB-DIAZ073385 |
| FAHB-DIAZ073393 | FAHB-DIAZ073393 |
| FAHB-DIAZ073394 | FAHB-DIAZ073395 |
| FAHB-DIAZ073396 | FAHB-DIAZ073397 |
| FAHB-DIAZ073398 | FAHB-DIAZ073398 |
| FAHB-DIAZ073874 | FAHB-DIAZ073876 |
| FAHB-DIAZ073883 | FAHB-DIAZ073884 |
| FAHB-DIAZ073909 | FAHB-DIAZ073910 |
| FAHB-DIAZ073911 | FAHB-DIAZ073911 |
| FAHB-DIAZ073912 | FAHB-DIAZ073913 |
| FAHB-DIAZ073914 | FAHB-DIAZ073914 |
| FAHB-DIAZ073916 | FAHB-DIAZ073916 |
| FAHB-DIAZ073917 | FAHB-DIAZ073917 |
| FAHB-DIAZ073918 | FAHB-DIAZ073918 |
| FAHB-DIAZ073919 | FAHB-DIAZ073919 |
| FAHB-DIAZ073920 | FAHB-DIAZ073920 |
| FAHB-DIAZ073921 | FAHB-DIAZ073921 |
| FAHB-DIAZ073922 | FAHB-DIAZ073922 |
| FAHB-DIAZ073923 | FAHB-DIAZ073923 |
| FAHB-DIAZ073924 | FAHB-DIAZ073924 |
| FAHB-DIAZ073968 | FAHB-DIAZ073970 |
| FAHB-DIAZ074136 | FAHB-DIAZ074137 |
| FAHB-DIAZ074185 | FAHB-DIAZ074185 |
| FAHB-DIAZ074186 | FAHB-DIAZ074186 |
| FAHB-DIAZ074196 | FAHB-DIAZ074196 |
| FAHB-DIAZ074318 | FAHB-DIAZ074319 |
| FAHB-DIAZ074346 | FAHB-DIAZ074346 |
| FAHB-DIAZ074356 | FAHB-DIAZ074358 |
| FAHB-DIAZ074467 | FAHB-DIAZ074467 |
| FAHB-DIAZ074474 | FAHB-DIAZ074475 |
| FAHB-DIAZ074476 | FAHB-DIAZ074477 |
| FAHB-DIAZ074489 | FAHB-DIAZ074489 |
| FAHB-DIAZ074719 | FAHB-DIAZ074720 |
| FAHB-DIAZ074721 | FAHB-DIAZ074727 |
| FAHB-DIAZ075130 | FAHB-DIAZ075131 |
| FAHB-DIAZ076218 | FAHB-DIAZ076220 |
| FAHB-DIAZ076257 | FAHB-DIAZ076257 |
| FAHB-DIAZ076275 | FAHB-DIAZ076283 |
| FAHB-DIAZ076284 | FAHB-DIAZ076285 |

ANALYSIS GROUP, INC.

Exhibit A
Page 43

*Confidential*

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

| | |
|---|---|
| FAHB-DIAZ076317 | FAHB-DIAZ076319 |
| FAHB-DIAZ076327 | FAHB-DIAZ076327 |
| FAHB-DIAZ076579 | FAHB-DIAZ076857 |
| FAHB-DIAZ078262 | FAHB-DIAZ078263 |
| FAHB-DIAZ078264 | FAHB-DIAZ078264 |
| FAHB-DIAZ078265 | FAHB-DIAZ078266 |
| FAHB-DIAZ078267 | FAHB-DIAZ078269 |
| FAHB-DIAZ078292 | FAHB-DIAZ078296 |
| FAHB-DIAZ078751 | FAHB-DIAZ078751 |
| FAHB-DIAZ078969 | FAHB-DIAZ078969 |
| FAHB-DIAZ079013 | FAHB-DIAZ079013 |
| FAHB-DIAZ079014 | FAHB-DIAZ079020 |
| FAHB-DIAZ079014 | FAHB-DIAZ079020 |
| FAHB-DIAZ079021 | FAHB-DIAZ079022 |
| FAHB-DIAZ079023 | FAHB-DIAZ079024 |
| FAHB-DIAZ079025 | FAHB-DIAZ079026 |
| FAHB-DIAZ079027 | FAHB-DIAZ079028 |
| FAHB-DIAZ079029 | FAHB-DIAZ079030 |
| FAHB-DIAZ079031 | FAHB-DIAZ079032 |
| FAHB-DIAZ079033 | FAHB-DIAZ079034 |
| FAHB-DIAZ079124 | FAHB-DIAZ079126 |
| FAHB-DIAZ079418 | FAHB-DIAZ079418 |
| FAHB-DIAZ079419 | FAHB-DIAZ079427 |
| FAHB-DIAZ081750 | FAHB-DIAZ081752 |
| FAHB-DIAZ081753 | FAHB-DIAZ081754 |
| FAHB-DIAZ081755 | FAHB-DIAZ081756 |
| FAHB-DIAZ081757 | FAHB-DIAZ081758 |
| FAHB-DIAZ081759 | FAHB-DIAZ081760 |
| FAHB-DIAZ081777 | FAHB-DIAZ081777 |
| FAHB-DIAZ082159 | FAHB-DIAZ082171 |
| FAHB-DIAZ082159 | FAHB-DIAZ082171 |
| FAHB-DIAZ082172 | FAHB-DIAZ082172 |
| FAHB-DIAZ082173 | FAHB-DIAZ082174 |
| FAHB-DIAZ082175 | FAHB-DIAZ082175 |
| FAHB-DIAZ082176 | FAHB-DIAZ082176 |
| FAHB-DIAZ085782 | FAHB-DIAZ085783 |
| FAHB-DIAZ086803 | FAHB-DIAZ086803 |
| FAHB-DIAZ087175 | FAHB-DIAZ087175 |
| FAHB-DIAZ087176 | FAHB-DIAZ087176 |
| FAHB-DIAZ087177 | FAHB-DIAZ087177 |
| FAHB-DIAZ087227 | FAHB-DIAZ087227 |
| FAHB-DIAZ087228 | FAHB-DIAZ087228 |
| FAHB-DIAZ087360 | FAHB-DIAZ087632 |
| FAHB-DIAZ087633 | FAHB-DIAZ087634 |
| FAHB-DIAZ087635 | FAHB-DIAZ087636 |
| FAHB-DIAZ087673 | FAHB-DIAZ087674 |
| FAHB-DIAZ087709 | FAHB-DIAZ087709 |
| FAHB-DIAZ087713 | FAHB-DIAZ087714 |
| FAHB-DIAZ087889 | FAHB-DIAZ087889 |
| FAHB-DIAZ088364 | FAHB-DIAZ088364 |
| FAHB-DIAZ088365 | FAHB-DIAZ088365 |
| FAHB-DIAZ088389 | FAHB-DIAZ088391 |
| FAHB-DIAZ088446 | FAHB-DIAZ088446 |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 44**

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

| | |
|---|---|
| FAHB-DIAZ088745 | FAHB-DIAZ088745 |
| FAHB-DIAZ093603 | FAHB-DIAZ093605 |
| FAHB-DIAZ093629 | FAHB-DIAZ093630 |
| FAHB-DIAZ096780 | FAHB-DIAZ096780 |
| FAHB-DIAZ096781 | FAHB-DIAZ096781 |
| FAHB-DIAZ096782 | FAHB-DIAZ096782 |
| FAHB-DIAZ098050 | FAHB-DIAZ098050 |
| FAHB-DIAZ098524 | FAHB-DIAZ098524 |
| FAHB-DIAZ098525 | FAHB-DIAZ098532 |
| FAHB-DIAZ098595 | FAHB-DIAZ098595 |
| FAHB-DIAZ098673 | FAHB-DIAZ098674 |
| FAHB-DIAZ104990 | FAHB-DIAZ104990 |
| FAHB-DIAZ108726 | FAHB-DIAZ108726 |
| FAHB-DIAZ108759 | FAHB-DIAZ108762 |
| FAHB-DIAZ109354 | FAHB-DIAZ109356 |
| FAHB-DIAZ109380 | FAHB-DIAZ109380 |
| FAHB-DIAZ109407 | FAHB-DIAZ109410 |
| FAHB-DIAZ109679 | FAHB-DIAZ109680 |
| FAHB-DIAZ109997 | FAHB-DIAZ109998 |
| FAHB-DIAZ113319 | FAHB-DIAZ113319 |
| FAHB-DIAZ114842 | FAHB-DIAZ114842 |
| FAHB-DIAZ114843 | FAHB-DIAZ114844 |
| FAHB-DIAZ114845 | FAHB-DIAZ114846 |
| FAHB-DIAZ114847 | FAHB-DIAZ114861 |
| FAHB-DIAZ114862 | FAHB-DIAZ114866 |
| FAHB-DIAZ114867 | FAHB-DIAZ114881 |
| FAHB-DIAZ114882 | FAHB-DIAZ114896 |
| FAHB-DIAZ114897 | FAHB-DIAZ114905 |
| FAHB-DIAZ 126173 | FAHB-DIAZ 126185 |
| FAHB-DIAZ 126186 | FAHB-DIAZ 126199 |
| FAHB-DIAZ 126200 | FAHB-DIAZ 126213 |
| FAHB-DIAZ 126214 | FAHB-DIAZ 126227 |
| FAHB-DIAZ 126228 | FAHB-DIAZ 126241 |
| FAHB-DIAZ 126242 | FAHB-DIAZ 126256 |
| FAHB-DIAZ 126257 | FAHB-DIAZ 126271 |
| FAHB-DIAZ0126272 | |
| FAHB-DIAZ0126273 | |
| FAHB-DIAZ0126274 | |
| FAHB-DIAZ0126275 | |
| FAHB-DIAZ0126276 | |
| FAHB-DIAZ0126277 | |
| FAHB-DIAZ0126278 | |
| FAHB-DIAZ0126279 | |
| FAHB-DIAZ0126280 | |
| FAHB-DIAZ0126281 | |
| FAHB-DIAZ0126282 | |
| FAHB-DIAZ0126283 | |
| FAHB-DIAZ0126284 | |
| FAHB-DIAZ0126285 | |
| FAHB-DIAZ0126286 | |
| FAHB-DIAZ0126287 | |
| FAHB-DIAZ0126288 | |
| FAHB-DIAZ0126289 | |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 45**

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

FAHB-DIAZ0126290
FAHB-DIAZ0126291
FAHB-DIAZ0126292
FAHB-DIAZ0126293
FAHB-DIAZ0126294
FAHB-DIAZ0126295
FAHB-DIAZ0126296
FAHB-DIAZ0126297
FAHB-DIAZ0126298
FAHB-DIAZ0126299
FAHB-DIAZ0126300
FAHB-DIAZ 126301
FAHB-DIAZ 126302

**Depositions**

| Description | Date |
| --- | --- |
| Deposition of Emily Diaz | 1/26/2011 |
| Deposition of Richard M. Gosselin | 5/10/2011 |

**Legal Documents**

| Description | Date |
| --- | --- |
| Attachment A - Interrogatory 7; Attachment B - Interrogatory 10 | |
| Dan Kaplan, et al v. Fidelity National Home Warranty Company, et al | 5/18/2010 |
| Defendant First American Home Buyers Protection Corporation's Second Amended Responses to Plaintiff Emily Diaz's First Set of Special Interrogatories | 4/6/2011 |
| Douglas J. Campion v. Old Republic Home Protection Co, Order Denying Class Certification | 1/6/2011 |
| Emily Diaz v. First American Home Buyers Protection Corporation, Plaintiff's First Expert Designation | 10/27/2010 |
| Emily Diaz v. First American Home Buyers Protection Corporation, Plaintiff's Notice of Withdrawal of Expert Witness Arnold Rodio | 3/24/2011 |
| Emily Diaz v. First American Home Buyers Protection Corporation, Order Granting In Part and Denying In Part Defendant's Motion to Dismiss | 9/21/2009 |
| Emily Diaz v. First American Home Buyers Protection Corporation, Second Amended Class Action Complaint | 5/17/2010 |
| Emily Diaz v. First American Home Buyers Protection Corporation, Defendant First American's Amended Responses to Plaintiff Emily Diaz's First Set of Special Interrogatories | 8/6/2010 |
| Kaplan v. Fidelity National Home Warranty Company, Class Certification Order | 10/28/2010 |
| Proof of Service | 4/7/2011 |

ANALYSIS GROUP, INC.

Exhibit A
Page 46

**Appendix B**
**Documents Considered**
**Emily Diaz v. First American Home Buyers Protection Corporation**

**Expert Reports**

| Description | Date |
|---|---|
| Expert Report of Arnold Rodio | 2/25/2010 |
| Expert Report of Arnold Rodio | 5/28/2010 |
| Report of Dr. Patrick F. Kennedy, Ph.D. | 3/24/2011 |
| Resume of W. John (Jack) Irwin II, PE, CFCC | 3/31/2010 |

**Publicaly Available Documents**

| Description | Accessed |
|---|---|
| First American Financial Corporation - Investor Relations page (http://investors.firstam.com/phoenix.zhtml?c=233852&p=irol-irhome) | 3/30/2011 |
| First American Home Buyers Protection Company - Service Providers page (https://homewarranty.firstam.com/serviceprovider/become_provider.aspx) | 3/30/2011 |
| First American Home Buyers Protection Company - Real Estate Professionals page, Benefits of a Home Warranty  (https://homewarranty.firstam.com/realtor/homewarrantybenefits.aspx) | 3/30/2011 |
| First American Home Buyers Protection Company - Real Estate Professionals page, Why Choose First American Home Buyers Protection (https://homewarranty.firstam.com/realtor/why_choose.aspx) | 3/30/2011 |
| First American Home Buyers Protection Company - Homeowners page, Why Buy a Home Warranty (https://homewarranty.firstam.com/homeowner/why_homewarranty.aspx) | 3/30/2011 |
| First American Home Buyers Protection Corporation - A Home Warranty Industry Leader (https://homewarranty.firstam.com/Default.aspx) | 3/31/2011 |
| First American Financial Corporation, December 31, 2010, Form 10-K | N/A |
| Laffont, Jean-Jaques and David Martimort. The Theory of Incentives - The Principal-Agent Model. Princeton University Press, 2002 | N/A |
| U.S. Census Bureau, New Residential Construction "Historic Annual Building Permit data by State" | 3/31/2011 |

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 47**

*Confidential*

**Exhibit 1**
Percentage of Claims Paid by Payment Method
*2007*

| State |
|-------|
| California |
| Texas |
| Arizona |
| Tennessee |
| Nevada |
| Florida |
| Ohio |
| North Carolina |
| Georgia |
| Utah |
| Mississippi |
| Oklahoma |
| Oregon |
| Virginia |
| Louisiana |
| Alabama |
| South Carolina |
| Pennsylvania |
| Missouri |
| Colorado |
| Michigan |
| Kansas |
| Maryland |
| Arkansas |
| Kentucky |
| Washington |
| Idaho |
| New Jersey |
| Indiana |
| Illinois |
| Nebraska |
| Wisconsin |
| New Mexico |
| New York |
| Connecticut |
| Minnesota |
| West Virginia |
| Montana |
| Iowa |
| South Dakota |
| Washington D.C. |
| Delaware |
| North Dakota |
| Alaska |
| Wyoming |
| Massachusetts |
| Hawaii |
| Rhode Island |

**REDACTED**

**Notes:**
[1] Percentages are based on the number of claims in the analysis.
[2] Approximately six percent of claims in the raw data have more than one payment method associated with the claim. These claims were omitted for the analysis.
[3] Claims for which First American was unable to identify the payment method associated with the claim were omitted from the analysis.

**Source:**
FAHB-DIAZ0126272.

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 48**

*Confidential*

**Exhibit 2**
**Percentage of Claims Paid by Payment Method**
*2008*

| State |
|-------|
| California |
| Texas |
| Arizona |
| Tennessee |
| Nevada |
| Ohio |
| Florida |
| North Carolina |
| Georgia |
| Mississippi |
| Virginia |
| Utah |
| Oklahoma |
| Louisiana |
| Pennsylvania |
| Oregon |
| Alabama |
| South Carolina |
| Maryland |
| Missouri |
| New Jersey |
| Colorado |
| Kansas |
| Michigan |
| Kentucky |
| Arkansas |
| Washington |
| Indiana |
| West Virginia |
| Idaho |
| Illinois |
| New York |
| Nebraska |
| Wisconsin |
| Connecticut |
| New Mexico |
| Minnesota |
| Montana |
| South Dakota |
| Iowa |
| Delaware |
| Washington D.C |
| Wyoming |
| North Dakota |
| Massachusetts |
| Alaska |
| Hawaii |
| Rhode Island |

**REDACTED**

**Notes:**
[1] Percentages are based on the number of claims in the analysis.
[2] Approximately six percent of claims in the raw data have more than one payment method associated with the claim. These claims were omitted for the analysis.
[3] Claims for which First American was unable to identify the payment method associated with the claim were omitted from the analysis.

**Source:**
FAHB-DIAZ0126272.

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 49**

*Confidential*

**Exhibit 3**
**Percentage of Claims Paid by Payment Method**
*2009*

| State |
| --- |
| California |
| Texas |
| Arizona |
| Tennessee |
| Ohio |
| Nevada |
| Virginia |
| North Carolina |
| Florida |
| Georgia |
| Mississippi |
| Utah |
| Pennsylvania |
| Oregon |
| South Carolina |
| Maryland |
| Missouri |
| Kansas |
| Kentucky |
| Colorado |
| West Virginia |
| Michigan |
| Arkansas |
| Oklahoma |
| Louisiana |
| Indiana |
| New Jersey |
| Idaho |
| Alabama |
| Nebraska |
| Washington |
| New Mexico |
| Illinois |
| New York |
| Montana |
| Wisconsin |
| Connecticut |
| Washington D.C |
| South Dakota |
| Wyoming |
| Minnesota |
| Iowa |
| Delaware |
| Hawaii |
| Alaska |
| North Dakota |
| Massachusetts |
| Rhode Island |

**REDACTED**

**Notes:**
[1] Percentages are based on the number of claims in the analysis.
[2] Approximately six percent of claims in the raw data have more than one payment method associated with the claim. These claims were omitted for the analysis.
[3] Claims for which First American was unable to identify the payment method associated with the claim were omitted from the analysis.

**Source:**
FAHB-DIAZ0126272.

ANALYSIS GROUP, INC.

45

**Exhibit A**
**Page 50**

*Confidential*

**Exhibit 4**
**Percentage of Claims Paid by Payment Method**
*2010*

| State |
| --- |
| California |
| Texas |
| Arizona |
| Tennessee |
| Virginia |
| North Carolina |
| Ohio |
| Nevada |
| Georgia |
| Mississippi |
| Florida |
| Pennsylvania |
| Utah |
| Maryland |
| South Carolina |
| Oregon |
| West Virginia |
| Missouri |
| Kentucky |
| Kansas |
| Arkansas |
| Michigan |
| Colorado |
| Indiana |
| Idaho |
| Nebraska |
| New Mexico |
| New Jersey |
| Washington D.C. |
| Montana |
| South Dakota |
| Wyoming |
| Delaware |
| Iowa |
| Hawaii |
| Alaska |
| Washington |
| North Dakota |
| Oklahoma |
| Alabama |
| Wisconsin |
| New York |
| Connecticut |
| Illinois |

**REDACTED**

**Notes:**
[1] Percentages are based on the number of claims in the analysis.
[2] Approximately six percent of claims in the raw data have more than one payment method associated with the claim. These claims were omitted for the analysis.
[3] Claims for which First American was unable to identify the payment method associated with the claim were omitted from the analysis.

**Source:**
FAHB-DIAZ0126272.

Analysis Group, Inc.

**Exhibit A**
**Page 51**

**Exhibit 5**
**Percentage of Claims Paid Using Time and Material Payment Method**
*2007 - 2010*

|              | 2007 | 2008 | 2009 | 2010 |
| ------------ | ---- | ---- | ---- | ---- |
| Category 1   |      |      |      |      |
| Category 2   |      | **REDACTED** |      |      |
| Category 3   |      |      |      |      |
| Category 4   |      |      |      |      |

**Notes:**

[1] Category 1 includes states where the total number of claims for the year was more than 25,000.

[2] Category 2 includes states where the total number of claims for the year was between 5,000 and 25,000.

[3] Category 3 includes states where the total number of claims for the year was between 1,000 and 5,000.

[4] Category 4 includes states where the total number of claims for the year was less than 1,000.

**Sources:**

See Exhibits 1-4 and FAHB-DIAZ0126272.

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 52**

*Confidential*

**Exhibit 6**
**New Privately-Owned Housing Units Authorized by Building Permits**
*2003 -2009*

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Arizona | 74,996 | 90,644 | 90,851 | 65,363 | 49,642 | 26,082 | 14,474 |
| California | 191,948 | 207,390 | 205,020 | 160,502 | 110,073 | 62,681 | 35,069 |
| Texas | 177,194 | 188,842 | 210,611 | 216,642 | 176,992 | 129,523 | 84,440 |
| **The Big 3 Total** | **444,138** | **486,876** | **506,482** | **442,507** | **336,707** | **218,286** | **133,983** |
| | | | | | | | |
| Georgia | 96,704 | 108,356 | 109,336 | 104,200 | 73,165 | 35,368 | 18,228 |
| North Carolina | 79,226 | 93,077 | 97,910 | 99,979 | 85,777 | 54,652 | 33,800 |
| New Mexico | 13,759 | 12,555 | 14,180 | 13,573 | 9,206 | 6,070 | 4,642 |
| Nevada | 43,366 | 44,556 | 47,728 | 39,445 | 27,209 | 14,881 | 6,764 |
| Oregon | 25,015 | 27,309 | 31,024 | 26,623 | 21,101 | 11,676 | 7,039 |
| Utah | 22,525 | 24,267 | 27,799 | 25,873 | 20,292 | 10,905 | 9,982 |
| Washington | 42,825 | 50,089 | 52,988 | 50,033 | 47,397 | 28,919 | 17,011 |
| **Mid Range Total** | **323,420** | **360,209** | **380,965** | **359,726** | **284,147** | **162,471** | **97,466** |
| | | | | | | | |
| Alabama | 22,256 | 27,411 | 30,612 | 32,034 | 25,845 | 17,464 | 13,266 |
| Alaska | 3,531 | 3,133 | 2,885 | 2,739 | 1,706 | 901 | 916 |
| Arkansas | 14,839 | 15,855 | 17,932 | 13,885 | 11,031 | 8,810 | 7,056 |
| Colorado | 39,569 | 46,499 | 45,891 | 38,343 | 29,454 | 18,998 | 9,355 |
| Connecticut | 10,435 | 11,837 | 11,885 | 9,236 | 7,746 | 5,220 | 3,786 |
| Delaware | 7,760 | 7,858 | 8,195 | 6,504 | 5,291 | 3,346 | 3,156 |
| Florida | 213,567 | 255,893 | 287,250 | 203,238 | 102,551 | 61,042 | 35,329 |
| Hawaii | 7,284 | 9,034 | 9,828 | 7,530 | 6,972 | 4,115 | 2,617 |
| Idaho | 15,091 | 18,108 | 21,578 | 17,075 | 12,105 | 6,470 | 4,863 |
| Illinois | 62,211 | 59,753 | 66,942 | 58,802 | 43,020 | 22,528 | 10,859 |
| Indiana | 39,421 | 39,233 | 38,476 | 29,069 | 23,841 | 16,631 | 12,555 |
| Iowa | 16,082 | 16,345 | 16,766 | 13,357 | 11,171 | 8,412 | 7,729 |
| Kansas | 15,049 | 13,301 | 14,048 | 14,619 | 11,473 | 8,188 | 6,677 |
| Kentucky | 20,404 | 22,623 | 21,159 | 16,628 | 14,938 | 10,494 | 7,398 |
| Louisiana | 22,220 | 22,989 | 22,811 | 28,671 | 23,379 | 16,305 | 12,513 |
| Maine | 7,933 | 8,771 | 8,969 | 7,293 | 5,873 | 3,615 | 3,121 |
| Maryland | 29,914 | 27,382 | 30,180 | 23,262 | 18,582 | 13,018 | 11,123 |
| Massachusetts | 20,257 | 22,477 | 24,549 | 19,580 | 15,358 | 9,883 | 7,941 |
| Michigan | 53,913 | 54,721 | 45,328 | 29,191 | 17,767 | 10,911 | 6,884 |
| Minnesota | 42,046 | 41,843 | 36,509 | 26,352 | 17,930 | 11,551 | 9,425 |
| Mississippi | 12,010 | 14,532 | 13,396 | 16,618 | 16,832 | 11,428 | 6,995 |
| Missouri | 29,309 | 32,791 | 33,114 | 29,172 | 21,525 | 13,273 | 10,056 |
| Montana | 3,767 | 4,975 | 4,803 | 4,542 | 4,153 | 2,376 | 1,686 |
| Nebraska | 10,339 | 10,920 | 9,929 | 8,230 | 7,604 | 6,346 | 5,150 |
| New Hampshire | 8,641 | 8,653 | 7,586 | 5,677 | 4,561 | 3,234 | 2,287 |
| New Jersey | 32,984 | 35,936 | 38,588 | 34,323 | 25,389 | 18,363 | 12,421 |
| New York | 49,708 | 53,497 | 61,949 | 54,382 | 54,059 | 51,637 | 18,344 |
| North Dakota | 3,721 | 4,033 | 4,038 | 3,529 | 3,360 | 2,833 | 3,195 |
| Ohio | 53,041 | 51,695 | 47,727 | 34,422 | 27,095 | 17,666 | 13,343 |
| Oklahoma | 14,968 | 17,068 | 18,362 | 15,840 | 14,730 | 10,502 | 8,753 |
| Pennsylvania | 47,356 | 49,665 | 44,525 | 39,128 | 33,665 | 24,577 | 18,275 |
| Rhode Island | 2,286 | 2,532 | 2,836 | 2,370 | 1,938 | 1,058 | 961 |
| South Carolina | 38,191 | 43,230 | 54,157 | 50,776 | 40,631 | 25,918 | 15,529 |
| South Dakota | 4,986 | 5,839 | 5,685 | 5,304 | 5,112 | 3,884 | 3,691 |
| Tennessee | 37,530 | 44,791 | 46,615 | 46,003 | 37,359 | 22,389 | 15,005 |
| Vermont | 2,843 | 3,588 | 2,917 | 2,626 | 2,056 | 1,444 | 1,367 |
| Virginia | 55,936 | 63,220 | 61,518 | 47,704 | 38,362 | 27,577 | 21,452 |
| West Virginia | 5,133 | 5,716 | 6,140 | 5,645 | 4,795 | 3,481 | 2,235 |
| Wisconsin | 40,884 | 39,992 | 35,334 | 27,329 | 21,837 | 15,509 | 10,780 |
| Wyoming | 2,814 | 3,317 | 3,997 | 3,537 | 4,555 | 2,669 | 2,294 |
| **All Others Total** | **1,120,229** | **1,221,056** | **1,265,009** | **1,034,565** | **775,651** | **524,066** | **350,388** |
| | | | | | | | |
| **U.S. Total** | **1,887,787** | **2,068,141** | **2,152,456** | **1,836,798** | **1,396,505** | **904,823** | **581,837** |

Source:
U.S. Census Bureau, New Residential Construction "Historic Annual Building Permit data by State."

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 53**

**Exhibit 7**
**New Privately-Owned Housing Units Authorized by Building Permits**
*Normalized to 2003 Units Authorized Value*

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Arizona | 1.00 | 1.21 | 1.21 | 0.87 | 0.66 | 0.35 | 0.19 |
| California | 1.00 | 1.08 | 1.07 | 0.84 | 0.57 | 0.33 | 0.18 |
| Texas | 1.00 | 1.07 | 1.19 | 1.22 | 1.00 | 0.73 | 0.48 |
| **The Big 3 Total** | **1.00** | **1.10** | **1.14** | **1.00** | **0.76** | **0.49** | **0.30** |
| Georgia | 1.00 | 1.12 | 1.13 | 1.08 | 0.76 | 0.37 | 0.19 |
| North Carolina | 1.00 | 1.17 | 1.24 | 1.26 | 1.08 | 0.69 | 0.43 |
| New Mexico | 1.00 | 0.91 | 1.03 | 0.99 | 0.67 | 0.44 | 0.34 |
| Nevada | 1.00 | 1.03 | 1.10 | 0.91 | 0.63 | 0.34 | 0.16 |
| Oregon | 1.00 | 1.09 | 1.24 | 1.06 | 0.84 | 0.47 | 0.28 |
| Utah | 1.00 | 1.08 | 1.23 | 1.15 | 0.90 | 0.48 | 0.44 |
| Washington | 1.00 | 1.17 | 1.24 | 1.17 | 1.11 | 0.68 | 0.40 |
| **Mid Range Total** | **1.00** | **1.11** | **1.18** | **1.11** | **0.88** | **0.50** | **0.30** |
| Alabama | 1.00 | 1.23 | 1.38 | 1.44 | 1.16 | 0.78 | 0.60 |
| Alaska | 1.00 | 0.89 | 0.82 | 0.78 | 0.48 | 0.26 | 0.26 |
| Arkansas | 1.00 | 1.07 | 1.21 | 0.94 | 0.74 | 0.59 | 0.48 |
| Colorado | 1.00 | 1.18 | 1.16 | 0.97 | 0.74 | 0.48 | 0.24 |
| Connecticut | 1.00 | 1.13 | 1.14 | 0.89 | 0.74 | 0.50 | 0.36 |
| Delaware | 1.00 | 1.01 | 1.06 | 0.84 | 0.68 | 0.43 | 0.41 |
| Florida | 1.00 | 1.20 | 1.35 | 0.95 | 0.48 | 0.29 | 0.17 |
| Hawaii | 1.00 | 1.24 | 1.35 | 1.03 | 0.96 | 0.56 | 0.36 |
| Idaho | 1.00 | 1.20 | 1.43 | 1.13 | 0.80 | 0.43 | 0.32 |
| Illinois | 1.00 | 0.96 | 1.08 | 0.95 | 0.69 | 0.36 | 0.17 |
| Indiana | 1.00 | 1.00 | 0.98 | 0.74 | 0.60 | 0.42 | 0.32 |
| Iowa | 1.00 | 1.02 | 1.04 | 0.83 | 0.69 | 0.52 | 0.48 |
| Kansas | 1.00 | 0.88 | 0.93 | 0.97 | 0.76 | 0.54 | 0.44 |
| Kentucky | 1.00 | 1.11 | 1.04 | 0.81 | 0.73 | 0.51 | 0.36 |
| Louisiana | 1.00 | 1.03 | 1.03 | 1.29 | 1.05 | 0.73 | 0.56 |
| Maine | 1.00 | 1.11 | 1.13 | 0.92 | 0.74 | 0.46 | 0.39 |
| Maryland | 1.00 | 0.92 | 1.01 | 0.78 | 0.62 | 0.44 | 0.37 |
| Massachusetts | 1.00 | 1.11 | 1.21 | 0.97 | 0.76 | 0.49 | 0.39 |
| Michigan | 1.00 | 1.01 | 0.84 | 0.54 | 0.33 | 0.20 | 0.13 |
| Minnesota | 1.00 | 1.00 | 0.87 | 0.63 | 0.43 | 0.27 | 0.22 |
| Mississippi | 1.00 | 1.21 | 1.12 | 1.38 | 1.40 | 0.95 | 0.58 |
| Missouri | 1.00 | 1.12 | 1.13 | 1.00 | 0.73 | 0.45 | 0.34 |
| Montana | 1.00 | 1.32 | 1.28 | 1.21 | 1.10 | 0.63 | 0.45 |
| Nebraska | 1.00 | 1.06 | 0.96 | 0.80 | 0.74 | 0.61 | 0.50 |
| New Hampshire | 1.00 | 1.00 | 0.88 | 0.66 | 0.53 | 0.37 | 0.26 |
| New Jersey | 1.00 | 1.09 | 1.17 | 1.04 | 0.77 | 0.56 | 0.38 |
| New York | 1.00 | 1.08 | 1.25 | 1.09 | 1.09 | 1.04 | 0.37 |
| North Dakota | 1.00 | 1.08 | 1.09 | 0.95 | 0.90 | 0.76 | 0.86 |
| Ohio | 1.00 | 0.97 | 0.90 | 0.65 | 0.51 | 0.33 | 0.25 |
| Oklahoma | 1.00 | 1.14 | 1.23 | 1.06 | 0.98 | 0.70 | 0.58 |
| Pennsylvania | 1.00 | 1.05 | 0.94 | 0.83 | 0.71 | 0.52 | 0.39 |
| Rhode Island | 1.00 | 1.11 | 1.24 | 1.04 | 0.85 | 0.46 | 0.42 |
| South Carolina | 1.00 | 1.13 | 1.42 | 1.33 | 1.06 | 0.68 | 0.41 |
| South Dakota | 1.00 | 1.17 | 1.14 | 1.06 | 1.03 | 0.78 | 0.74 |
| Tennessee | 1.00 | 1.19 | 1.24 | 1.23 | 1.00 | 0.60 | 0.40 |
| Vermont | 1.00 | 1.26 | 1.03 | 0.92 | 0.72 | 0.51 | 0.48 |
| Virginia | 1.00 | 1.13 | 1.10 | 0.85 | 0.69 | 0.49 | 0.38 |
| West Virginia | 1.00 | 1.11 | 1.20 | 1.10 | 0.93 | 0.68 | 0.44 |
| Wisconsin | 1.00 | 0.98 | 0.86 | 0.67 | 0.53 | 0.38 | 0.26 |
| Wyoming | 1.00 | 1.18 | 1.42 | 1.26 | 1.62 | 0.95 | 0.82 |
| **All Others Total** | **1.00** | **1.09** | **1.13** | **0.92** | **0.69** | **0.47** | **0.31** |
| **U.S. Total** | **1.00** | **1.10** | **1.14** | **0.97** | **0.74** | **0.48** | **0.31** |

Source:
  U.S. Census Bureau, New Residential Construction "Historic Annual Building Permit data by State."

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 54**

**Exhibit 8**
**Percentage of Claims Paid Using Fixed Rate Payment Method**
*2007 - 2010*

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Category 1 | | | | |
| Category 2 | | | | |
| Category 3 | | **REDACTED** | | |
| Category 4 | | | | |

**Notes:**
[1] Category 1 includes states where the total number of claims for the year was more than 25,000.
[2] Category 2 includes states where the total number of claims for the year was between 5,000 and 25,000.
[3] Category 3 includes states where the total number of claims for the year was between 1,000 and 5,000.
[4] Category 4 includes states where the total number of claims for the year was less than 1,000.

**Sources:**
See Exhibits 1-4 and FAHB-DIAZ0126272.

50

ANALYSIS GROUP, INC.

**Exhibit A**
**Page 55**